EL PUEBLO DE PUERTO RICO, apelado, *v.* MAXIMILIANO AMPARO CONCEPCIÓN, apelante.

Número: CR-96-1          Resuelto: 30 de junio de 1998

*Mario A. Rodríguez Torres* y *Linette Sánchez Quiñones*, abogados del apelante; *Edda Serrano Blasini, Subprocura-*

*dora General,* y *Ángel M. Rivera Rivera,* abogados de El Pueblo.

## SENTENCIA

El 15 de febrero de 1994, alrededor de las diez y treinta de la mañana (10:30 A.M.), Maximiliano Amparo Concepción (en adelante el apelante) se dirigió a la sucursal del Banco Popular (en adelante el Banco) de San Patricio, en Guaynabo. Allí lo atendió la Sra. Alma Nydia Ortiz, Oficial del Banco, quien lo ayudó a abrir una cuenta de cheques. Como depósito requerido, el acusado apelante dio cien dólares ($100) en efectivo.

Al regresar a casa de su novia, donde estaba residiendo, recibió de manos de la Sra. Sonia E. Liranzo, su suegra, un sobre que supuestamente había llegado por medio del correo ese mismo día. Tal sobre contenía un cheque a nombre del acusado por la cantidad de ciento setenta mil seiscientos cincuenta dólares ($170,650), que según éste representaba el pago por la venta de una propiedad inmueble en la República Dominicana. Cabe señalar que el librador del cheque era la compañía Polo Ralph Lauren.(¹)

Inmediatamente el apelante llamó al Banco para averiguar cuál sucursal le quedaba más cerca y así depositar el cheque antes de que cerraran. Le notificaron que la más cercana era la localizada en la avenida Piñeiro de Puerto Nuevo, por lo que procedió a dirigirse a ésta. Llegó allí cerca de las dos y veinte de la tarde (2:20 P.M.). Lo atendió el Sr. Héctor Iván Mora Nevárez, Pagador Principal (*head teller*) de esa sucursal. Al realizar la transacción, el señor Mora escribió el número de cuenta dado por el acusado

---

(¹) La señora Liranzo declaró en el juicio que había recibido el cheque en su dirección residencial, avenida De Diego Núm. 763, altos, esto a pesar de que la dirección a la cual estaba dirigido era avenida De Diego Núm. 268. No pudo explicar cómo el cheque había llegado allí. En su declaración, el propio acusado tampoco pudo explicar cómo había recibido el cheque en casa de su suegra.

apelante en el sistema computadorizado del Banco. Dicho sistema no reflejó información alguna sobre la cuenta. En ese momento, el acusado apelante estaba saliendo de la sucursal, por lo que fue llamado para verificar si había algún error con el número. Resultó ser que como la cuenta se había abierto ese mismo día, el sistema no contenía ninguna información sobre su existencia.

Al día siguiente, el apelante se comunicó con el Banco para verificar si el balance del cheque depositado se reflejaba en la computadora. Nuevamente lo atendió el señor Mora, quien le dijo que pasara por la sucursal. Ya en el Banco, el pagador principal le comunicó al apelante que no se había acreditado el balance de dinero en su cuenta porque el cheque era de Estados Unidos. Le pidió ver la copia del recibo del depósito. Además, le aconsejó que volviera a comunicarse con el Banco al día siguiente.

El 17 de febrero de 1994 el apelante volvió a llamar al Banco. Allí le comunicaron que debía pasar por la sucursal de Puerto Nuevo. Al presentarse en ella misma, varios oficiales de seguridad lo arrestaron porque, según la investigación interna del Banco, el cheque había sido falsificado. Lo trasladaron al edificio federal, donde fue interrogado. Luego, las autoridades federales lo entregaron a las autoridades locales, quienes lo trasladaron a un cuartel de la Policía, le hicieron las advertencias y lo interrogaron.

El juicio se celebró ante un Jurado y fue encontrado culpable por violaciones al Art. 272 del Código Penal, 33 L.P.R.A. sec. 4592 (posesión y traspaso de documentos falsificados), y al Art. 166 del Código Penal, 33 L.P.R.A. sec. 4272 (apropiación ilegal agravada), en su modalidad de tentativa. El 29 de agosto de 1994 se dictó sentencia, en la que se le impusieron las penas de diez (10) años por el delito de posesión y traspaso de documentos falsificados, y seis (6) años por el delito de tentativa de apropiación ilegal agravada, que habrían de ser cumplidas consecutivamente.

Inconforme con esta determinación, Maximiliano Amparo Concepción acudió ante nos mediante un escrito de apelación.[2] En síntesis alegó que el foro de instancia erró: al denegarle la solicitud de defensa *pro se*; al admitir en evidencia el testimonio del agente investigador del caso sobre las tarjetas falsificadas de seguro social, y al no cumplir con el *quantum* de prueba requerido en convicciones criminales e imponer múltiples castigos por un mismo acto, lo cual está proscrito por el concurso de delitos.

Por entender que procede la defensa de concurso de delitos, *modificamos la sentencia recurrida a los únicos fines de anular la condena impuesta por el delito de tentativa de apropiación ilegal agravada, Art. 166 del Código Penal, supra. La convicción por este delito subsiste. Así modificada, se confirma la sentencia recurrida.*

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada Señora Naveira de Rodón emitió una opinión de conformidad, a la cual se unieron el Juez Presidente Señor Andréu García y el Juez Asociado Señor Corrada Del Río.

(*Fdo.*) Isabel Llompart Zeno
*Secretaria del Tribunal Supremo*

---

[2] El apelante presentó, por derecho propio, un escrito titulado Notificación de Apelación, el cual fue recibido en este Tribunal el 1ro de septiembre de 1994. Mediante Resolución de 28 de octubre de 1994, admitimos dicho escrito como un recurso de apelación. El 29 de noviembre siguiente emitimos una resolución en la que denegamos la solicitud de representación por derecho propio presentada por el apelante. El 9 de febrero de 1995 se refirió este caso al Colegio de Abogados para que le designara una representación legal a Maximiliano Amparo Concepción, para que se perfeccionara el recurso ante nos. Ante la inacción del Colegio de Abogados, se designó a su Presidente, Lcdo. Manuel Fermín Arraiza, como representante legal del acusado apelante. Luego de varios trámites, el 30 de septiembre de 1997 la representación legal asignada al acusado presentó ante este Tribunal un escrito de apelación y se perfeccionó el recurso de autos.

— O —

Opinión de conformidad emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se unen el Juez Presidente Señor Andréu García y el Juez Asociado Señor Corrada Del Río.

Estamos conformes con lo resuelto por este Tribunal en el caso de epígrafe. Consideramos que el acusado apelante Maximiliano Amparo Concepción no estaba capacitado para autorrepresentarse. Asimismo, no hay duda de que los elementos del delito de tentativa de apropiación ilegal agravada fueron probados más allá de duda razonable. El único planteamiento meritorio aducido por el apelante es el concerniente al concurso de delitos. A continuación expondremos nuestro criterio.

I

*Hechos*

Se acusó al apelante Maximiliano Amparo Concepción por violaciones al Art. 272 del Código Penal, 33 L.P.R.A. sec. 4592 (posesión y traspaso de documentos falsificados) y al Art. 166 del Código Penal, 33 L.P.R.A. sec. 4272 (apropiación ilegal agravada), en su modalidad de tentativa. Se presentaron estas acusaciones porque, el 15 de febrero de 1994, el apelante intentó depositar en su cuenta de banco un cheque falsificado a nombre suyo, cuyo librador era la compañía Polo Ralph Lauren. Mediante un juicio por jurado, se le encontró culpable de dichos delitos. Se le impuso la pena de diez (10) años por el delito de posesión y traspaso de documentos falsificados y de seis (6) años por el de tentativa de apropiación ilegal agravada, que habrían de ser cumplidas consecutivamente.

Inconforme, Maximiliano Amparo Concepción presentó un recurso de apelación ante este Tribunal. Alegó, en sín-

tesis, que había errado el tribunal de instancia al denegarle el derecho de autorrepresentarse. Además, adujo que dicho tribunal había admitido incorrectamente en evidencia el testimonio de un agente investigador sobre unas tarjetas falsificadas de seguro social. Por último, señaló que no se probaron los elementos de los delitos más allá de duda razonable y que se había impuesto, contrario a la norma de concurso de delitos, múltiples castigos por un mismo acto.

Expuestos los hechos pertinentes, procede que discutamos los errores planteados.

## II

*Derecho a la autorrepresentación*

La Sexta Enmienda de la Constitución de Estados Unidos establece el derecho a estar asistido por un abogado, así como los demás derechos fundamentales de todo acusado. En lo pertinente, dispone: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence". Const. EE. UU., U.S.C. Debido a que éste, al igual que los demás derechos establecidos por esta enmienda, son básicos para el buen funcionamiento del sistema de justicia criminal, éstos son parte del debido procedimiento de ley garantizado por la Decimocuarta Enmienda. *Faretta v. California*, 422 U.S. 806, 818 (1975). Además, véase, *Lizarríbar v. Martínez Gelpí*, 121 D.P.R. 770, 776 (1988). Incluso se ha dicho que este derecho es un requisito necesario para la misma existencia de un juicio justo. *Argersinger v. Hamlin*, 407 U.S. 25, 31 (1972).

En varias ocasiones, el Tribunal Supremo de Estados Unidos ha tenido que dilucidar controversias sobre la renuncia de un acusado a su derecho a tener representación legal. En *Johnson v. Zerbst*, 304 U.S. 458 (1938), dos (2) acusados no tuvieron representación legal en el juicio cele-

brado en su contra, ya que comparecieron sin abogado y no le solicitaron al foro de instancia que les nombrara alguno de oficio. El Tribunal Supremo federal resolvió que:

> ... [T]he average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel. That which is simple, orderly and necessary to the lawyer, to the untrained layman may appear intricate, complex and mysterious. *Johnson v. Zerbst*, supra, págs. 462–463.

Más adelante añadió:

> The "... right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defen[s]e, even though he have a perfect one. *Johnson v. Zerbst*, supra, pág. 463, citando a *Powell v. Alabama*, 287 U.S. 45, 68 y 69 (1932).

Asimismo, resolvió que sobre los hombros del juez de instancia recae una gran responsabilidad, ya que debe determinar si la renuncia hecha por el acusado es una inteligente y competente. Dicha determinación debe aparecer en el expediente del tribunal. *Johnson v. Zerbst*, supra, pág. 465. A su vez, *el juez debe tomar en cuenta los hechos particulares y las circunstancias que rodean cada caso en específico, incluyendo el trasfondo, la experiencia y la conducta del acusado, para poder tomar su determinación.* Íd., pág. 464.

En 1974, el Tribunal Supremo federal resolvió el caso normativo sobre el derecho a la autorrepresentación de un acusado: *Faretta v. California*, supra. En éste, una persona de apellido Faretta fue acusada y sometida a un procedi-

miento judicial en el Tribunal Superior del condado de Los Ángeles. Antes de la vista del juicio, solicitó representarse por derecho propio. El juez de instancia, luego de una determinación preliminar favorable al acusado, decidió que éste no había tomado una decisión inteligente y con pleno conocimiento de todo lo que implicaba. Además, resolvió que al acusado no lo cobijaba el derecho constitucional de la autorrepresentación. El Tribunal Supremo de Estados Unidos revocó, expresando lo siguiente:

> ... The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant —not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. ... An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense. (Énfasis en el original.) *Faretta v. California,* supra, págs. 820–821.

En cuanto a la calidad y las circunstancias de la renuncia, el Tribunal federal expresó lo siguiente:

> ... Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams v. U[.S.] ex rel. McCann,* 317 U.S. [269, 279 (1942)]. *Faretta v. California,* supra, pág. 835.

En *McKaskle v. Wiggins,* 465 U.S. 168 (1983), el Tribunal Supremo federal se enfrentó a una situación especial de autorrepresentación, en la que el acusado estaba asistido por un abogado nombrado por el tribunal. En lo aquí pertinente, este caso estableció, siguiendo a *Faretta v. California,* supra, que todo acusado tiene derecho a autorre-

presentarse, según la Sexta Enmienda de la Constitución de Estados Unidos siempre que: (a) el acusado inteligentemente y con conocimiento de causa (*knowingly and intelligently*) renuncie a su derecho a estar asistido por un abogado, y (b) el acusado es capaz y está dispuesto *(able and willing) a respetar o seguir* las reglas procesales y el *protocolo de la sala del tribunal. Mckaskle v. Wiggins*, supra, pág. 173.

Por último, en el caso *Patterson v. Illinois*, 487 U.S. 285, 298–299 (1988), se resolvió que debido a la importancia del abogado de defensa en los juicios criminales, es necesario que se le ofrezca al acusado información específica sobre los posibles efectos de la renuncia al derecho de estar asistido por un abogado. Además, se debe celebrar un procedimiento o una vista, antes de permitirle que renuncie a su derecho a la asistencia de abogado.

En el marco del Derecho puertorriqueño, nuestra Constitución utiliza un lenguaje similar al de la federal cuando establece los derechos de un acusado en todo procedimiento criminal. En lo pertinente, dice: "En todos los procesos criminales, el acusado disfrutará del derecho ... a tener asistencia de abogado." Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 11, L.P.R.A., Tomo 1, ed. 1982, págs. 307–308. Este Tribunal también ha tenido que resolver controversias acerca de la renuncia a la representación legal y el derecho a la autorrepresentación. El caso más importante sobre el particular es el de *Lizarríbar v. Martínez Gelpí*, supra. En éste se discutió ampliamente el derecho a la autorrepresentación dentro del contexto de un litigio civil. También se discutió la aplicación de esta norma a los litigios criminales.

En *Lizarríbar v. Martínez Gelpí*, supra, págs. 785–786, establecimos once (11) criterios para orientar la discreción de los tribunales al hacer valer este derecho. Estos son: (a) que la representación, como regla general, no puede ser híbrida, esto es, el acusado no debe estar representado por

abogado y, a la vez, representarse por derecho propio; (b) que la decisión tiene que haber sido tomada voluntariamente, inteligente y con pleno conocimiento de causa; (c) que tiene que hacerse mediante una solicitud expresa (inequívoca) al tribunal; (d) que debe ser formulada oportunamente; (e) que, además, *se tomará en consideración la demora o interrupción de los procedimientos y su efecto sobre la adecuada administración de la justicia*; (f) que se deberá atender al *factor de la calidad de la representación que la parte habrá de ser capaz de procurarse*, así como la complejidad de la controversia que se adjudicará; (g) que el acusado tendrá el deber de cumplir esencialmente con las reglas procesales y el derecho aplicables, aunque no se le requerirá un conocimiento técnico de éstos; (h) que el magistrado no está obligado a ilustrar al acusado acerca de esas leyes o reglas; (i) que el magistrado tampoco está obligado a nombrarle abogados asesores durante el proceso; (j) que el magistrado no tiene el deber de inquirir respecto a las razones por las cuales el acusado ha elegido la representación por derecho propio, aunque en los casos que estime convenientes podría hacerlo, y (k) que el magistrado tampoco tiene la obligación de informar al acusado de su derecho a la autorrepresentación.

También, hicimos constar que la indebida denegación del derecho a la autorrepresentación no acarrea automáticamente la revocación de la sentencia. Para que esto suceda es necesario que la parte afectada con la determinación demuestre que ha sufrido un grave perjuicio. *Lizarríbar v. Martínez Gelpí*, supra, pág. 786.

De otra parte, con relación a los casos criminales, el Prof. Ernesto L. Chiesa nos indica que esta doctrina del grave perjuicio (*harmless error*) no puede, por imperativo constitucional federal, aplicar. E.L. Chiesa, *Derecho procesal penal de Puerto Rico*, Colombia, Ed. Forum, 1995, Vol. 1, págs. 370–371. El profesor Chiesa fundamenta su análisis en *McKlaske v. Wiggins*, supra, págs. 177–178 esc. 8, en

el cual el Tribunal Supremo federal hizo la expresión siguiente:

> Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied, its deprivation cannot be harmless.

Siguiendo esta misma línea de pensamiento, el tratadista Cook indica:

> If it is the case that exercising the right of self-representation will more often than not be to the disadvantage of the accused it would follow that in most cases the denial of the right will be harmless error. If, on the other hand, what is at stake is a right concededly antithetical to the notion of a fair trial, exercisable by the accused irrespective of its counter-productiveness, then it may be contended that the denial of the right of self-representation can *never* be harmless. Perhaps this is the answer derivable from *Faretta* itself, since at no point in the opinion does the court discuss or consider relevant whether the accused was prejudiced by the denial of his request to represent himself. (Escolios omitidos y énfasis en el original.) 3 *Cook, Constitutional Rights of the Accused*, 3rd ed., Sec. 9:1, pág. 9–15 (1996).

Por lo tanto, no es aplicable a los casos criminales la norma que le exige al acusado demostrar que ha sufrido un grave perjuicio por la indebida denegación del derecho a la autorrepresentación.

Procederemos a aplicar el derecho expuesto a los hechos del caso ante nuestra consideración.

## III

*Aplicación del derecho de autorrepresentación a los hechos del caso*

El 31 de marzo de 1994 se realizó el acto de lectura de la acusación. En éste, el apelante estuvo representado por un abogado de la Sociedad para Asistencia Legal (en adelante

la Sociedad). Dicho abogado le informó al tribunal que el apelante desconfiaba de los abogados de la Sociedad y deseaba representarse por derecho propio, ya que había estudiado derecho en Estados Unidos.([1]) El Juez de instancia refirió este asunto a la consideración de la Juez Ygrí Rivera de Martínez.

El 7 de abril de 1994, el apelante presentó en el foro de instancia una moción para que se relevara al abogado de la Sociedad como su representante legal. Adujo que durante la vista preliminar, había intentado ayudar a su abogado durante el contrainterrogatorio, pero éste lo "amenazó ... con pararse de la silla y salir de la sala si el acusado seguía insistiendo con dicha ayuda". Además, argumentó que los abogados asignados al caso no se habían preparado adecuadamente.

Casi un mes después, el 2 de mayo de 1994, comparecieron las partes ante la Juez Rivera de Martínez para la celebración del juicio. Allí el abogado de la Sociedad manifestó que el apelante había expresado en el acto de lectura de la acusación que deseaba representarse por derecho propio y que en esa calidad había sometido ciertas mociones. Por su parte, el Fiscal expresó que no había recibido copia alguna de éstas. Indicó que había hablado con el Lcdo. Luis Dueño Vargas, quien le había dicho que estaba realizando ciertos trámites relativos al caso del apelante. Añadió que más tarde dicho licenciado le había comunicado que no iba a representar al acusado.

En ese momento el tribunal de instancia hizo constar para el expediente que en el acto de la lectura de acusación, la determinación de la petición del acusado de repre-

---

[1] El acusado alegó que había estudiado Derecho por dos (2) años en John Jay College en Nueva York. Es una norma establecida que meras alegaciones no hacen prueba. Además, esto constituye una declaración en beneficio propio (*self-serving evidence*), que puede ser excluida por los tribunales. *Pueblo v. Tirado de Santos*, 91 D.P.R. 210, 214 (1964). El acusado debió traer algún tipo de evidencia, que no fuera su propio testimonio, sobre el hecho de estos estudios.

sentarse por derecho propio había sido dejada para una fecha posterior, pero la Oficina de Secretaría no había hecho las diligencias necesarias para que se resolviera este asunto. Además, la juez de instancia hizo constar, según surge de la Minuta de 2 de mayo de 1994, que "el Tribunal [tenía] que analizar todas esas mociones y [determinar] si efectivamente est[aba] preparado el acusado por el hecho de que estudió [derecho], est[aba] preparado para representarse él personalmente". El foro de instancia ordenó que se citara al licenciado Dueño Vargas a la próxima vista para dilucidar la cuestión de la representación.

El 11 de mayo se celebró una vista de rebaja de fianza. En ella el apelante solicitó que se adelantara la fecha del juicio porque un guardia penal lo había amenazado. El foro de instancia le indicó que el proceso se había retrasado por los múltiples escritos presentados por derecho propio y por no dejarse asesorar por los abogados de la Sociedad. Minuta de 11 de mayo de 1994.

El 17 de mayo de 1994, el Ministerio Fiscal presentó una moción informativa, en la cual expuso el derecho aplicable a las renuncias de representación y a las solicitudes de representación por derecho propio.

La vista sobre la renuncia de representación legal se celebró el 20 de mayo siguiente. El abogado de la Sociedad alegó que no podía representar al acusado porque ya éste le había pagado dinero a un abogado de la práctica privada (licenciado Dueño Vargas) para que lo representara. A su vez, el licenciado Dueño Vargas declaró que se había entrevistado con el apelante en la cárcel y éste le había comunicado que necesitaba representación legal para el juicio, pero no para someter las mociones por derecho propio que estaba presentando continuamente ante el tribunal. Además, indicó que, en fecha posterior, el apelante le había enviado una carta en la que le comunicaba que había per-

dido su confianza y que le devolviera el dinero. El apelante se había reiterado en esta posición.

El tribunal de instancia determinó que el Lcdo. Luis Dueño Vargas estaba obligado a continuar con la representación legal del apelante. Concluyó que "el imputado no est[aba] preparado para representarse solo en el juicio". Minuta de 20 de mayo de 1994.

El 2 de junio de 1994, el tribunal de instancia recibió una carta del apelante, en la que éste expresaba que estaba "incapacitado para seguir con el juicio en este caso, porque [había] perdido un 30 por ciento o m[á]s de [su] memoria por el efecto del serio golpe que [había] recib[ido] en la cabeza y no rec[ordaba] muchos eventos del pasado". Además, expresó que tenía "momentos en [los] cuales [se] confund[ía] y [perdía] la razón". Asimismo, solicitó que se señalara la vista del caso para una fecha en exceso de un año.

Posteriormente, el apelante envió varias cartas dirigidas al tribunal de instancia para expresar su intención de quitarse la vida mediante una "huelga de hambre y agua". El tribunal remitió esta información a la Administración de Corrección para que ésta tomara las medidas correspondientes. Mediante la carta recibida el 13 de junio de 1994, el apelante le indicó al tribunal que sería imposible que se celebrara el juicio el 15 de agosto de 1994, según había sido señalado.

Debido a todas las comunicaciones del apelante, el 17 de junio de 1994 se celebró una vista de emergencia. Allí el tribunal pudo constatar personalmente la condición del acusado, determinando que éste se encontraba físicamente bien. El tribunal ordenó que se evaluara siquiátricamente al apelante para determinar si estaba procesable o no.[2]

Después de esta vista, el apelante continuó enviando cartas y mociones por derecho propio al tribunal para soli-

---

[2] En la vista de procesabilidad, celebrada el 28 de junio de 1994, se determinó que el apelante estaba procesable, a pesar de que tenía pensamiento suicida.

citar vistas y pedir la inhibición de la Juez Rivera de Martínez.(3)

(3) Una vez resueltos todos estos asuntos, la vista del caso se celebró los días 15, 16, 17, 18, 19 y 22 de agosto de 1994. El 19 de agosto ocurrió un incidente durante el interrogatorio de la Sra. Johan Elizabeth Mangree, testigo de cargo. Copiamos directamente de la Transcripción de evidencia, págs. 86–91:

"HON. JUEZ:

"Sí, el compañero nos está pidiendo autorización p[or] que dice que su representado se siente mal. Le vamos a pedir al acusado que aguante unos minutos que este testimonio es breve.

"SR. ACUSADO:

"No puedo. Me estoy asfixiando.

"HON. JUEZ:

"Nosotros entendemos que si usted hace un esfuerzo puede. Usted estuvo aquí toda la mañana de hoy.

"SEÑOR ACUSADO:

"A mí me sacaron del Hospital para traerme acá.

"HON. FISCAL:

"Su Señoría, muy respetuosamente, que se llame (incomprensible), para ver si es cierto que lo sacaron del hospital y si hay alguna recomendación ....

"HON. JUEZ:

"Yo no quiero hacer un 'issue' de eso, pero yo lo vi aquí toda la mañana muy bien.

"SEÑOR ACUSADO:

"Yo estoy deshidrata[d]o, con la presión alta, [lo ofrecido por la enfermera] no es medicina.

"HON. JUEZ:

"La presión no es[tá] alta. La presión ...

"SEÑOR ACUSADO:

"En 150 está.

"HON. JUEZ:

"... [la enfermera] nos dijo que [estaba] un poquito alta producto del mismo vómito, que no es vómito. Yo lo he estado observando aquí que se pone el dedo aquí y se lo hunde y él es bien manipulador. Y nosotros no vamos a permitir manipulaciones aquí. Se está provocando el vómito visto por nosotros. Pero no quise decirlo en frente del jurado para no ocasionar un problema en ese sentido porque no voy a disolver ese jurado. Pero nosotros lo acabamos de ver.

"SEÑOR ACUSADO:

"Eso es una calumnia.

"HON. JUEZ:

"No es ninguna calumnia y usted lo sabe.

"SEÑOR ACUSADO:

"Eso es una calumnia. Eso es una calumnia lo que ella está diciendo. Ella no me ha visto a mí meterme el dedo.

"SEÑOR ALGUACIL:

"Cállese.

"SEÑOR ACUSADO:

"No me hable así oiga. Estoy malo. Cállese usted.

De los hechos expuestos surge con meridiana claridad que la decisión tomada por la juez de instancia al no permitir que el acusado se representara por derecho propio fue acertada. De haberlo permitido, las interrupciones y dilaciones en la administración de la justicia hubieran hecho imposible que se celebrara un juicio justo y rápido. Con sus acciones, el acusado demostró que no estaba capacitado para autorrepresentarse. Por ello, el primer error señalado no se cometió.

Pasemos ahora a discutir el segundo planteamiento de error.

## IV

*Admisibilidad en evidencia del testimonio sobre las tarjetas de seguro social*

Según disponen las Reglas de Evidencia, toda evidencia que sea pertinente será admisible en el tribunal. Regla 18(A) de Evidencia, 32 L.P.R.A. Ap. IV. Las mismas reglas definen lo que es evidencia pertinente: "aquella tendente a hacer la existencia de un hecho más probable o menos probable de lo que sería sin tal evidencia." Regla 18(B) de Evidencia, 32 L.P.R.A. Ap. IV.

A pesar de esto, existen ciertos factores que se deben tomar en consideración con relación al valor probatorio de

---

"SEÑOR ALGUACIL:
"Cállese.
"SEÑOR ACUSADO:
"Cállese usted.
"HON. JUEZ:
"Hemos ordenado que vengan aquí varios alguaciles. Sabemos que él hace eso porque nosotros en una ocasión tuvimos que señalar una vista de emergencia porque él alegaba que lo metían en calabo[z]o y lo pateaban, que le daban, que lo sodomizaban, que lo habían herido, que tenía heridas profundas en el cráneo y que estaba en una huelga de hambre si no veíamos el caso. Y cuando lo citamos no tenía absolutamente nada. Entre otras cosas por eso fue que ordenamos la evaluación [siquiátrica] y hemos estado indagando ahora durante el receso un poco más sobre los análisis que se le hicieron y a él no se le encontró nada, nada. Todo lo que dijo fue una mentira. Y sabemos que él es bien manipulador y ... queremos evitar una situación ...."

la evidencia que se va a admitir. Estos son: (a) el peligro de causar perjuicio indebido; (b) la probabilidad de confusión; (c) desorientación del Jurado; (d) la dilación de los procedimientos, y (e) la innecesaria presentación de prueba acumulativa.

Por su parte, la Regla 4 de Evidencia, 32 L.P.R.A. Ap. IV, establece los efectos que conlleva la determinación de admisión de evidencia. En lo pertinente, esta regla dispone que

[n]o se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia a menos que:
    (1) La evidencia fue erróneamente admitida a pesar de la oportuna y correcta objeción de la parte perjudicada por la admisión, y
    (2) el tribunal que considera el efecto de la admisión errónea entiende que ésta fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita.

Según estableciéramos en el caso *Pueblo v. Franceschini Sáez*, 110 D.P.R. 794 (1981), discutiendo la Regla 5 de Evidencia, 32 L.P.R.A. Ap. IV, como norma general una parte no puede alegar en apelación que se excluyó erróneamente cierta evidencia utilizando un fundamento distinto al que invocó en los procedimientos en instancia al objetar su exclusión. Íd., pág. 797. A pesar de esto, puede haber circunstancias en que la naturaleza, el propósito y la pertinencia de la prueba se desprendan del contexto de su presentación o que el fundamento para objetar sea evidente. En tal caso, se puede presentar este "nuevo" fundamento en apelación. Íd., pág. 798. Esta normativa también es aplicable a las situaciones en que se objeta la admisión de evidencia. "Sólo cuando el fundamento de inadmisibilidad es obvio o cuando la evidencia objetada es radicalmente inadmisible, es que se permite que [el fundamento de la objeción en instancia] sea uno de naturaleza general, como por ejemplo, prueba de referencia, privilegio, etc." (Escolio omitido.) R. Emmanuelli Jiménez, *Prontuario de derecho*

*probatorio puertorriqueño*, Santo Domingo, Ed. Corripio, 1994, pág. 50.

En *Pueblo v. Ruiz Bosch*, 127 D.P.R. 762, 782 (1991), expresamos que si en los procedimientos en instancia se interponía la objeción a la admisibilidad de la prueba de forma oportuna y correcta, el tribunal apelativo tiene la obligación de determinar si dicha evidencia admitida fue el factor decisivo o sustancial en la sentencia de la cual se solicita revisión.[4] Sin embargo, si la admisión de evidencia constituye un error craso y perjudicial, aunque no haya mediado objeción alguna, el tribunal apelativo puede considerar los planteamientos hechos por las partes para evitar que el no corregir tal error resulte en un fracaso de la justicia. Regla 6 de Evidencia, 32 L.P.R.A. Ap. IV; *Pueblo v. Ruiz Bosch*, supra, pág. 783.

Procederemos a aplicar el derecho expuesto a los hechos específicos del caso ante nuestra consideración. Según surge de la transcripción de los procedimientos y de los alegatos de las partes, el problema con la admisibilidad de evidencia surgió durante el contrainterrogatorio del testigo de defensa, Agente Dionisio Rivera Carrasquillo, sobre dos (2) tarjetas de seguro social que se le ocuparon al apelante.[5] A continuación copiamos de la Transcripción de Evidencia, pág. 166, la parte pertinente:

---

[4] En *Pueblo v. Ruiz Bosch*, 127 D.P.R. 762, 782 esc. 5 (1991), definimos el término factor decisivo o sustancial. A esos efectos, establecimos que

"[e]l criterio que debe utilizarse ... *en casos 'ordinarios' de errores en la admisión de evidencia es si de no haberse admitido* erróneamente la prueba en controversia 'probablemente el resultado hubiera sido distinto'. *Pueblo v. Mangual Hernández*, 111 D.P.R. 136, 145 (1981). *Esto es, si la evidencia erróneamente admitida puede haber tenido una influencia notable, determinante, y hasta desmedida, en la mente del juzgador de los hechos en relación con el veredicto, fallo o sentencia que el mismo emitiera en el caso, sea este civil o criminal.* Véase *Kotteakos v. United States*, 328 U.S. 750 (1946)." (Énfasis en el original.)

[5] Originalmente éste era un testigo de cargo, pero el Ministerio Fiscal no lo utilizó y lo puso a disposición de la defensa. T.E., pág. 50. Antes de su declaración, el abogado de defensa expuso para el expediente que tenía objeción a presentar el testimonio de este testigo, pero lo presentaba porque el acusado estaba "prácticamente obligándo[lo]". T.E., pág. 152.

HON. FISCAL:

P. Okey. ¿Mire a ver si es o no cierto que este señor [el apelante] cuando lo arrestaron tenía encima dos tarjetas de Seguro Social diferentes?

R. Eso es correcto.

P. ¿Y usted las vio?

R. Eso es correcto.

DEFENSA[:]

Vuestro Honor, eso .excede el directo porque nosotros no pre[g]untamos sobre las tarjetas de Seguro Social.

HON. JUEZ:

¿Quieren acercarse al estrado? Vamos a la esencia de la pregunta.

HON. FISCAL:

Eso es todo.

El 22 de agosto de 1994, en el último día de la vista, la defensa solicitó que se decretase un *mistrial* por dos (2) razones: (1) se presentaron los seguros sociales y se trajo en evidencia el hecho de que el acusado estaba en territorio estadounidense en forma ilegal, cuando esto no era cierto, y (2) que el Jurado lo había visto esposado. La juez de instancia determinó que éstas no eran razones para conceder un *mistrial*.([6]) Con relación a las tarjetas de seguro social, indicó que éstas y la ilegalidad de la estadía del acusado en territorio americano se había mencionado incidentalmente y ese testimonio había sido desmentido por el propio acusado.

Analicemos las actuaciones de los abogados de las partes. En el contrainterrogatorio del agente Rivera Carrasquillo, la defensa objetó la pregunta del Fiscal por el fundamento de que ese aspecto no se había cubierto en el interrogatorio directo. En su recurso de apelación, el apelante alega que ese era el fundamento correcto para la objeción. Por su parte, el Procurador General alega que ese fundamento no procedía porque la defensa había "abierto las puertas para que se le preguntara sobre eso". Una vez

---

([6]) Cuando el apelante reformuló su objeción a que se admitiera el testimonio de las tarjetas de seguro social en su solicitud de *mistrial*, se fundamentó en que el testimonio sobre el estado de residente del acusado apelante era erróneo.

analizado el interrogatorio directo de la defensa a este testigo, estamos de acuerdo con el argumento del Procurador General. El abogado de defensa le preguntó al agente Rivera Carrasquillo todo lo que había hecho en el edificio federal cuando fue a buscar al apelante; lo que se hizo en la oficina de inmigración; cuántas personas había; dónde estaba detenido el acusado apelante; a dónde se lo llevó luego; qué hizo con él en el cuartel de la Policía; qué pasó después. Obviamente, mediante su interrogatorio, la defensa abrió las puertas para que el Ministerio Fiscal indagara sobre todos los pormenores y las situaciones que habían ocurrido con el acusado, incluyendo lo que le habían ocupado durante los diversos interrogatorios (tanto federal como estatal) a los que fue sometido.

Por otro lado, aunque se hubiera objetado por el fundamento correcto, tampoco procedería revocar la sentencia dictada. El testimonio del agente Rivera Carrasquillo no constituyó un factor sustancial o decisivo en el dictamen de instancia. Éste consistió de expresiones cortas y aisladas. Vista la totalidad de la prueba, esta declaración en específico no tuvo una influencia notable, determinante o desmedida en la mente del Jurado cuando rindió el veredicto de culpabilidad.

Tampoco se cometió el segundo error señalado.[7]

A continuación discutiremos el tercer planteamiento de error.

---

[7] En su escrito de apelación, el acusado apelante intenta traer nuevos fundamentos para la supresión de evidencia. Específicamente, alega que el Ministerio Fiscal estaba tratando de traer ante la atención del Jurado prueba sobre el carácter del apelante. Visto el contexto en el cual se presentó esta declaración, dicho fundamento para objetar no era evidente ni procedía en derecho.

## V

*"Quantum" de la prueba en casos criminales y los elementos del delito de tentativa de apropiación ilegal agravada*

El apelante alega que la determinación del Jurado no fue conforme a derecho, ya que la prueba presentada no es suficiente para avalar los elementos constitutivos del delito de tentativa de apropiación ilegal agravada.[8] Además, plantea que los elementos de dicho delito no se probaron más allá de duda razonable.

Para que una convicción sea válida, hemos establecido reiteradamente como norma que es necesario que se prueben todos los elementos del delito imputado y se logre conectar al acusado con ellos. *Pueblo v. Calderón Álvarez*, 140 D.P.R. 627 (1996); *Pueblo v. González Román*, 138 D.P.R. 691 (1995); *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988).

La evidencia presentada por el Ministerio Fiscal debe contener unos requisitos mínimos. Tiene que ser suficiente en derecho, satisfactoria y que produzca certeza o convicción moral en un ánimo no prevenido. La insatisfacción con la prueba es lo que se conoce como "duda razonable y fundada". *Pueblo v. González Román*, supra; *Pueblo v. Rivero, Lugo y Almodóvar*, supra; *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1972).

El Código Penal establece el delito de apropiación ilegal en los términos siguientes:

Toda persona que ilegalmente se apropiare sin violencia ni intimidación de bienes muebles, pertenecientes a otra, será sancionada con pena de reclusión .... Art. 165 del Código Penal, 33 L.P.R.A. sec. 4271.

---

[8] Según el Código Penal, existe tentativa cuando una persona realiza acciones o incurre en omisiones que estén dirigidas a la consumación de un delito, pero éste no surge por circunstancias extrañas a la voluntad del actor. Art. 26 del Código Penal, 33 L.P.R.A. sec. 3121.

La apropiación se considera agravada cuando los bienes apropiados tuvieren un valor mayor de doscientos dólares ($200). Art. 166 del Código Penal, *supra*. Según las definiciones ofrecidas por el propio Código, apropiarse "[i]ncluye el malversar, *defraudar, ejercer control ilegal,* usar, sustraer, *apoderarse,* o en cualquier forma *hacer propio cualquier bien o cosa* en forma temporal o permanente". (Énfasis suplido.) Art. 7(5) del Código Penal, 33 L.P.R.A. sec. 3022(5).

Este delito exige la intención específica de apropiarse de los bienes. *Pueblo v. Miranda Ortiz,* 117 D.P.R. 188, 194 (1986); *Pueblo v. Padró Ríos,* 105 D.P.R. 713, 716 (1977); *Pueblo v. Ríos,* 69 D.P.R. 830, 837 (1949). Dicha intención se puede probar mediante las circunstancias relacionadas con el delito, la capacidad mental y sus manifestaciones y la conducta de la persona. *Pueblo v. Miranda Ortiz,* supra; Art. 14 del Código Penal, 33 L.P.R.A. sec. 3061.

Además, debemos tener en cuenta la reiterada norma de que en ausencia de pasión, prejuicio, parcialidad o error manifiesto, no intervendremos con la apreciación de la prueba que haya hecho el juzgador de los hechos en instancia. *Pueblo v. Chévere Heredia,* 139 D.P.R. 1 (1995); *Pueblo v. Rodríguez Román,* 128 D.P.R. 121, 129 (1991); *Pueblo v. Acabá Raíces,* 118 D.P.R. 369 (1987); *Pueblo v. Borrero Robles,* 113 D.P.R. 387 (1982); *Pueblo v. Millán Meléndez,* 110 D.P.R. 171 (1980).

Pasemos a analizar las declaraciones de los testigos de cargo para determinar si se probaron más allá de duda razonable los elementos del delito de tentativa de apropiación ilegal agravada y si se logró conectar al acusado con ellos.

La primer testigo de cargo fue la Sra. Alma Nydia Ortiz, Oficial de Banco de la sucursal de San Patricio. En síntesis, declaró que el 15 de febrero de 1994 el acusado se había presentado a la sucursal de San Patricio para abrir una cuenta de cheques, que ella lo había atendido y que su

dirección era, según el expediente del Banco, avenida De Diego Núm. 601, en Puerto Nuevo.

El segundo testigo fue el Sr. Héctor Iván Mora Nevárez, pagador principal de la sucursal de la avenida Piñeiro. En su testimonio declaró que le tocó atender al acusado Maximiliano Amparo Concepción cuando éste fue al Banco a depositar un cheque por la cantidad de aproximadamente ciento setenta y siete mil dólares ($177,000). Le llamó la atención la cantidad del cheque, por ser tan elevada. Expresó que había dejado aparte la hoja de depósito y el cheque porque este último le resultaba curioso, ya que no tenía las pestañitas que se le forman cuando se desprende de la libreta a la que está adherido. Además, éste era de la compañía Polo Ralph Lauren (en adelante Polo), que no acostumbra hacer cheques de este tipo para personas particulares.

En la sesión del tribunal celebrada el 19 de agosto de 1994, testificó la Sra. Ana Nieves Rivera, Oficial de Banco en la sucursal de la avenida Piñeiro. Declaró que tiene a su cargo la seguridad interna de esa sucursal, incluyendo fraudes con cheques. Expresó que había examinado el cheque; que estaba a nombre del acusado; que la dirección que aparecía era avenida De Diego Núm. 268, Río Piedras; que el librador era Polo. A preguntas del Ministerio Fiscal, indicó que había examinado el cheque buscando ciertas características que hicieran evidente que era falso. Constató que el borde superior no tenía pestañitas que denotaran que había sido sacado de una libreta de cheques, sino que más bien había sido cortado con una tijera. Además, notó que la cantidad que habría de pagarse no estaba escrita al lado de la palabra *PAY*, sino más arriba de donde debía ir. Lo mismo pasaba con el nombre de la persona a la que iba dirigida el cheque. También le llamó la atención el hecho de que estuviera escrito a maquinilla, cuando este tipo de compañía usualmente utiliza computadoras. Añadió que el número del cheque se veía irregular, ya que todos los nú-

meros no estaban al mismo nivel. En el contrainterrogatorio, el abogado de defensa le preguntó si era normal que los cheques se escribieran a maquinilla. La testigo contestó que sí. Además, ésta expresó que, al ver el cheque por primera vez, pensaba que había un noventa por ciento (90%) de probabilidad de que el mismo fuera falso.

El último testigo del Ministerio Fiscal fue la Sra. Johan E. Mangree, Vicepresidenta y Tesorera de Polo. Ésta identificó el cheque que estaba a nombre de Maximiliano Amparo Concepción, como perteneciente a su compañía. Indicó que el número de éste no estaba en la serie utilizada por ellos. Añadió que la compañía nunca había expedido un cheque a nombre del acusado. Además, declaró que el acusado no había trabajado en Polo ni había hecho transacción alguna con ellos. Expresó que la compañía había reportado un cheque en blanco como perdido o hurtado. Este cheque tenía el mismo número que el cheque presentado en evidencia que aparece a nombre del acusado.

Ésta fue la prueba de cargo. Ella fue creída por el Jurado y es suficiente para apoyar la convicción.

Por otro lado, el Jurado no creyó la teoría de la defensa de que el cheque que había recibido el acusado había sido el producto de una venta. Además, éste no pudo explicar satisfactoriamente por qué un cheque enviado a la avenida De Diego Núm. 268 había sido recibido en la avenida De Diego Núm. 763, altos. De todas las circunstancias expuestas en el juicio, el Jurado dedujo que el acusado tenía la intención de apropiarse ilegalmente de unos fondos pertenecientes a la compañía Polo.(9) Este error no se cometió.

---

(9) Este mismo análisis aplica para el requisito de "a sabiendas" del delito de posesión y traspaso de documentos falsificados. Art. 272 del Código Penal, 33 L.P.R.A. sec. 4592. El Jurado no creyó que el acusado no hubiera sabido que el cheque era falsificado.

# VI

*Concurso de delitos*

Por último, alega el apelante que la sentencia impuesta por el foro de instancia viola la protección estatutaria contra el concurso de delitos, según lo dispone el Art. 63 del Código Penal, 33 L.P.R.A. sec. 3321.([10]) En su alegato expresa que el curso de acción que dio lugar a la presentación de cargos por los delitos imputados fue uno solo y estaba dirigido a obtener un objetivo único. El Procurador General estuvo de acuerdo con este análisis.

Según resolviéramos en *Pueblo v. Meléndez Cartagena*, 106 D.P.R. 338 (1977), citando el caso *Neal v. State*, 357 P.2d 836, 843–844 (Cal. 1961), el concurso de delitos depende de la intención y el objetivo del autor; si todos los delitos cometidos sirven un solo propósito, se puede castigar al autor por cualquiera de ellos, pero no por más de uno. También establecimos que el concepto "acto u omisión" a que se refiere el Art. 63 del Código Penal, *supra*, no necesariamente es el acto que denota una actuación específica, sino que puede ser un curso de conducta con un objetivo y propósito determinados. *Pueblo v. Meléndez Cartagena*, supra, pág. 346, citando a *González v. Tribunal Superior*, 100 D.P.R. 136, 143–144 (1971).([11])

---

([10]) Este artículo dispone lo siguiente:

"Salvo lo dispuesto en la sección siguiente, un acto u omisión penable de distintos modos por diferentes disposiciones penales, podrá castigarse con arreglo a cualquiera de dichas disposiciones pero en ningún caso bajo más de una.

"La absolución o convicción y sentencia bajo alguna de ellas impedirá todo procedimiento judicial por el mismo acto u omisión, bajo cualquiera de las demás." 33 L.P.R.A. sec. 3321.

([11]) En el caso *Pueblo v. Calderón Álvarez*, 140 D.P.R. 627 (1996), nos expresamos sobre el concurso entre los delitos de apropiación ilegal agravada, Art. 166 del Código Penal, 33 L.P.R.A. sec. 4272, e interferencia con contadores o aparatos de comunicación, Art. 169 del Código Penal, 33 L.P.R.A. sec. 4275. Resolvimos que: "El 'acto' [realizado por el acusado] es punible por el Art. 166, *supra*, en tanto el bien apropiado —energía eléctrica— es propiedad del Estado, así como por el Art. 169, *supra*, por haberse realizado la apropiación mediante la interferencia fraudulenta de un contador. En tal caso, aun cuando fue legítimo procesar [al acusado] por los dos (2) delitos, no se le puede castigar por ambos. Procede aplicar el principio bajo el cual el delito mayor subsume al menor ...". *Pueblo v. Calderón Álvarez*, supra, pág. 646.

Por otro lado, cuando se anula la pena impuesta por el delito en el concurso, la convicción subsiste. *Pueblo v. Calderón Álvarez*, supra; *Pueblo v. Meléndez Cartagena*, supra, pág. 347; *Pueblo v. De la Cruz*, 106 D.P.R. 378, 386 (1977).

En el caso ante nuestra consideración se encontró culpable al apelante de los delitos de tentativa de apropiación ilegal agravada y posesión y traspaso de documentos falsificados. Ambos delitos surgieron de una misma acción, de un solo acto ejecutado por el acusado. Dicho acto fue el llevar al Banco el cheque para intentar depositarlo en su cuenta.([12]) Igualmente, la intención que movió al apelante a cometer dichos delitos fue una sola: apoderarse del dinero perteneciente a la compañía Polo. Por lo tanto, y bajo la situación de hechos específica del caso de autos, aunque se podía enjuiciar al apelante por ambos delitos, el tribunal de instancia no podía imponer pena de reclusión por los dos (2), ya que procede la defensa de concurso de delitos. Debemos anular la pena de reclusión de seis (6) años impuesta por violación al Art. 166 del Código Penal, *supra*, en su modalidad de tentativa. La convicción por este delito queda vigente.

Por las razones antes expuestas, estamos conformes con la decisión de la mayoría de este Tribunal, que modifica la sentencia apelada a los únicos fines de anular la condena impuesta por el delito de tentativa de apropiación ilegal agravada, y así modificada, la confirma.

---

([12]) Debemos recordar que como elementos del delito de posesión y traspaso de documentos falsificados están el que una persona, con intención de defraudar a otra, posea, use, circule, venda, pase o *trate de traspasar* un documento como verdadero cuando sabe que el mismo es falso o está alterado, falsificado o imitado. Art. 272 del Código Penal, *supra*.