Coll Martí, Jueza Ponente
TEXTO COMPLETO DE LA SENTENCIA
Ante este Foro acude el apelante Luis Santiago Morales mediante Escrito de Apelación y nos solicita la revocación de una Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 29 de diciembre de 2004. Mediante el referido dictamen, el foro apelado sentenció al apelante a cumplir 257 años de prisión por la comisión de varios delitos.
Resolvemos, con el beneficio de la comparecencia de las partes, los autos originales y la Transcripción de la Prueba Oral, no sin antes exponer los hechos relevantes al presente caso, conforme el expediente apelativo.
I
Una condena criminal y la posterior sentencia a cumplir de 257 años de prisión motivaron la presentación de la apelación de epígrafe. Según surge de autos, el apelante fue encontrado culpable mediante juicio por jurado por hechos acaecidos el 5 de noviembre de 2001 que desembocaron en la muerte de un policía. Por los mismos hechos, y en juicio conjuntamente celebrado con el apelante, el tribunal encontró culpable al coacusado Héctor Torres Vega. La condena y sentencia del coacusado Torres Vega fue confirmada por este Tribunal el 30 de *810 septiembre de 2004 en el caso KLAN-02-00728.
Del expediente apelativo surge que la noche del 5 de noviembre del 2001, los agentes Geyl Galarza Valentín y Carlos Acosta Rey se encontraban patrullando en el Precinto de Bayamón Norte. En horas de la noche-alrededor de las diez p.m.-, los agentes recibieron una llamada por el Sistema 911 que advertía la presencia de cuatro individuos en la zona industrial Corujo, contiguo a la empresa Empire Gas. Al adentrarse en el área, los agentes detectaron la presencia de varios individuos. La prueba oral reflejó que cuando los agentes se identificaron como policías, los individuos abrieron fuego contra ellos. El intercambio de disparos desembocó en la muerte del agente Carlos Acosta Rey. En el lugar de los hechos se arrestó a una persona herida (Jorge Miranda Class) y un rifle AK-47. Los demás participantes, entre ellos el apelante, fueron arrestados en los días posteriores a la muerte del agente Acosta. Como evidencia, el Ministerio Público presentó las armas ocupadas, bulto de herramientas, proyectiles hallados en la autopsia, y chalecos a pruebas de balas, entre otra prueba.
El 7 de noviembre de 2001 se determinó causa probable para arrestar al aquí apelante Luis Santiago Morales y al coacusado Héctor Torres Vega. Trasciende de autos que el coacusado Miranda Class se convirtió en testigo principal de El Pueblo.
Celebrado el extenso juicio y aquilatada la prueba presentada, el Tribunal de Primera Instancia impuso al apelante las siguientes penas a cumplirse consecutivamente:

“1. Asesinato en Primer Grado (Felony Murder Rule), noventa y nueve (99) años de reclusión;

2. Tent. Art. 83 del Código Penal, diez (10) años de reclusión;

3. Tent. Art. 83 del Código Penal, diez (10) años de reclusión

4. Inf. Art. 4.04 de la Ley de Armas, veinte (20) años de reclusión;

5. Inf. Art. 4.04 de la Ley de Armas, veinte (20) años de reclusión;

6. Inf. Art. 4.04 de la Ley de Armas, veinte (20) años de reclusión;

7. Inf. Art. 4.15 de la Ley de Armas, diez (10) años de reclusión;

8. Inf. Art. 4.15 de la Ley de Armas, diez (10) años de reclusión;

9. Inf. Art. 2.14 (B-l) de la Ley de Armas, treinta y seis (36) años de reclusión;

10. Inf. Art. 166 del Código Penal, doce (12) años de reclusión;

11. Inf. Art. 171 del Código Penal, nueve (9) años de reclusión;

12. Inf. Art. 172 del Código Penal, seis (6) meses de reclusión;

13. Inf. Art. 179 del Código Penal, seis (6) meses de reclusión. ”

El apelante no está de acuerdo con el desenlace de su caso, por lo que inicialmente recurrió ante nos por derecho propio y alegó que se cometieron varios errores en el proceso que ameritan que su sentencia sea revocada. Luego de varios trámites apelativos -entre los que se destacan la asignación de la apelación a la Sociedad Para Asistencia Legal-, el apelante presentó el Alegato del Apelante, en el cual imputó al Tribunal *811 de Primera Instancia la comisión de los siguientes errores:

“Primero: Erró el Honorable Tribunal de Primera Instancia al encontrar al apelante (sic) y sentenciarlo por infracción al Art. 4.15 de la Ley de Armas en clara contravención al principio de especialidad establecido en el Art. 5 del Código Penal.

Segundo: Erró el Honorable Tribunal de Primera Instancia al encontrar al apelante culpable y sentenciarlo por tentativa de asesinato en clara contravención al debido proceso de ley; al principio de legalidad; a los artículos 14, 15, 26 y 82 del Código Penal; y a la jurisprudencia aplicable.

Tercero: Erró el Honorable Tribunal de Primera Instancia al encontrar al apelante culpable con prueba que no estableció su culpabilidad más allá de duda razonable. ”

Posteriormente y luego de concedidas varias prórrogas, el Procurador General de Puerto Rico presentó su Alegato. Estamos en posición de resolver. Así lo hacemos.
II
A. Principio de Especialidad
El principio de especialidad surge del Artículo 5 del Código Penal de 1974, 33 L.P.R.A. § 3005, vigente a la fecha de los hechos, dispone que:
“Si la misma materia fuera prevista por una ley o disposición especial y por una ley o disposición de carácter general, se aplicará la ley especial en cuanto no se establezca lo contrario.” 33 L.P.R.A. § 3005.
Cuando el artículo habla de “la misma materia”, no se refiere al simple hecho de que dos delitos penales sean aplicables a la misma conducta. Se requiere una relación entre un delito general y uno especial, donde el delito especial contiene elementos adicionales no incluidos en el general. Cuando tal sea el caso, aplicará la ley o disposición especial sobre la ley general. Sobre el particular, el Tribunal Supremo de Puerto Rico citando a L. Jiménez de Asúa, La ley y el delito, 5ta ed., Buenos Aires, Ed. Sudamericana, 1967, pág. 146, ha expresado que dos leyes se hallan en relación general y especial cuando los requisitos del tipo general “están todos entendidos con el especial [...]”. Además, cuando hay otras condiciones calificativas a virtud de las cuales “la ley especial tiene preferencia sobre [la ley] general en su aplicación. ” Pueblo v. Calderón Alvarez, 140 D.P.R. 627, 644 (1996); Pueblo v. Pérez Casillas, 117 D.P.R. 380, 399 (1986).
Dicho de otro modo, el principio de especialidad es una regla de interpretación estatutaria que toma en . cuenta la relación de jerarquía en que se hallan las distintas normas que concurren en su aplicación a un hecho delictivo. Jiménez de Asúa, op. cit., pág. 140. Véase, además, D. Nevares Muñiz,' Derecho Penal Puertorriqueño, Instituto para el Desarrollo del Derecho, Inc., San Juan, 5ta ed., 2005, pág, 136. En estos casos . se aplica la ley especial bajo la máxima lex specíalis derogat legi genereali, pues se parte del supuesto que la finalidad de una regulación especial es excluir o desplazar la general. Y es que así tiene que ser, pues quien realiza el tipo específico siempre consuma el genérico, mientras que a la inversa no sucede lo contrario.
B. Principio de Legalidad
El Artículo 8 del Código Penal de 1974, 33 L.P.R.A. § 3031, expresa que:

“No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido por la ley como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido.

*812
No se podrán crear por analogía delitos, penas ni medidas de seguridad. ”

El principio de legalidad, como se sabe, se basa en el aforismo "nullum crimen, nulla poena sine lege" y está recogido en los Artículos 8 y 9 del Código Penal de 1974, particularmente en el Artículo 8 antes transcrito. Pueblo v. González Vega, 147 D.P.R. 692 (1999); Pueblo v. Figueroa Garriga, 140 D.P.R. 225 (1996). En el contexto de las leyes penales, conforme a este principio, el debido proceso de ley exige, como condición para su validez, que los estatutos sean claros y precisos. Pueblo v. Ríos Dávila, 143 D.P.R. 687, 696-97 (1997). En virtud del principio de legalidad, la interpretación de los estatutos penales debe hacerse de manera restrictiva en cuanto perjudica al acusado y liberalmente en cuanto lo favorece. Pueblo v. Negrón Calderón, 157 D.P.R. 413, 423 (2002); Pueblo v. Figueroa Santana, 154 D.P.R. 717 (2001).
El estatuto penal debe ser lo suficientemente explícito para notificar de antemano cuál conducta será susceptible de ser castigada. Esto es, la ley no puede estar redactada de tal forma que un individuo de inteligencia común esté obligado a adivinar su significado; ello violaría el debido proceso de ley. La ley debe prevenir a los ciudadanos de la conducta prohibida. Pueblo v. Ríos Dávila, supra, a las págs. 697-698. La conducta prohibida debe quedar tan clara y diáfanamente descrita que una persona común y corriente, que carezca de conocimientos legales, pueda comprender razonablemente lo que se prohíbe.
Sin embargo, el principio de legaüdad no requiere una enumeración exhaustiva de todos los elementos que configuren el delito; cierto grado de generalización es permisible. Lo determinante es que el ciudadano común pueda conocer lo que está prohibido y permitido por la ley penal. El propósito de la ley penal no es atrapar al incauto, sino prevenir a los ciudadanos de las conductas que ella prohíbe. Pueblo v. Ríos Dávila, supra, a la pág. 704.
De otra parte, destacamos que la intención criminal o mens rea es el elemento anímico que antecede la actividad delictiva; se produce en la mente del acusado, y se traduce como voluntad de actuar. Para que la conducta imputada sea intencional, se requiere que el acusado anticipe el resultado de su acción u omisión y actúe de conformidad o, aunque no quiera el resultado punible, que pueda prever las consecuencias naturales o probables de su acción u omisión. Artículo 15 del Código Penal de Puerto Rico de 1974, 33 L.P.R.A. § 3062. Específicamente, el Código Penal de 1974 disponía en su Artículo 14 que:

“Nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o negligencia criminal. ”

A renglón seguido, el mismo artículo identificaba los elementos de los que podía deducirse la intención o negligencia criminal del imputado:
“[l]as circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona. ” 33 L.P.R.A. § 3061.
Aunque el elemento mental es subjetivo, puede inferirse de las circunstancias pertinentes retrospectivas, de las concomitantes e, incluso, de aquellas posteriores a la comisión del delito o falta “que tienden a demostrar una determinada intención o negligencia.” Dora Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, San Juan, 1989, pág. 165.
Sobre este aspecto, el Tribunal Supremo ha expresado que “en aquellos casos donde se imputa un delito de intención específica y donde no existen manifestaciones del imputado que reflejen su estado anímico al momento de cometer los hechos, el ministerio público depende de la prueba relacionada con las circunstancias en que se comete el delito para probar el elemento de la intención criminal. Esto es, la intención criminal se evalúa en virtud de los hechos pertinentes anteriores, concomitantes y posteriores del caso”. Pueblo v. *813 McCloskey Díaz, res. el 8 de marzo de 2005, 164 D.P.R._(2005), 2005 J.T.S. 32, a la pág. 817.
Por otro lado, el Tribunal Supremo ha definido “arma mortífera” como “aquel instrumento que cause la muerte o grave daño corporal al ser usado del modo corriente y usual que su forma y construcción revela. ” Pueblo v. Dávila, 23 D.P.R. 337, 338 (1915). Es decir, las armas de fuego son armas mortíferas para propósitos del Artículo 95, si se usan como tales; por ejemplo, que estando cargadas, se hale el gatillo para expeler el proyectil. Pueblo v. Haddock, 43 D.P.R. 752, 753 (1932). “El uso de un arma puede implicar razonablemente una intención de matar...”. Nuevo Código Penal de Puerto Rico, Comentado por Dora Nevárez Muñiz, Edición 2004-2005, Instituto para el Desarrollo del Derecho, Inc., a las págs. 129-130. Entre las circunstancias que pueden considerarse para establecer la culpabilidad de un acusado, están las siguientes:

“a. circunstancias prospectivas: hechos anteriores al crimen y que apuntan hacia su futura comisión (motivo, plan, preparación, etc.); ■

b. circunstancias concomitantes: hechos simultáneos al crimen que permiten que se lleve a cabo por el acusado (presencia en el lugar del crimen, acceso a la víctima, etc.);

c. circunstancias retrospectivas: hechos posteriores al crimen que sugieren que el acusado lo cometió (fuga, ocultación de evidencia, etc.)” Pueblo v. Torres Nieves, 105 D.P.R. 340, 346, (1976).
C. Duda Razonable
El Artículo II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico le garantiza al acusado la presunción de inocencia y exige que el Estado presente prueba suficiente y satisfactoria que establezca más allá de duda razonable cada uno de los elementos del delito y conecte al acusado con dicho acto delictivo. Pueblo v. González Román, 138 D.P.R. 691, 707-708 (1995).
De igual manera, la Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110, establece, en términos específicos, que:

“[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en todo caso de existir duda razonable acerca de su culpabilidad, se le absolverá. ”

La máxima que rige nuestro ordenamiento a los fines de que la culpabilidad de una persona que ha sido acusada de delito sea demostrada con prueba suficiente y más allá de toda duda razonable, es consustancial con la presunción de inocencia y constituye uno de los imperativos del debido proceso de ley. Pueblo v. León Martínez, 132 D.P.R 746, 764 (1993).
Debemos advertir que, como consecuencia jurídica inescapable del mencionado mandato constitucional, es al Estado a quien le corresponde la obligación de presentar evidencia y sobrellevar la carga de la prueba para establecer la culpabilidad del acusado. Tal obligación no es susceptible de ser descargada livianamente, pues,no basta que el Estado presente prueba que meramente verse sobre cada uno de los elementos del delito imputado, sino que es necesario que dicha prueba, además de suficiente, sea satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Véase, Pueblo v. Rosaly Soto, 128 D.P.R. 729, 739 (1991); Pueblo v. Rodríguez Román, 128 D.P.R. 121, 131 (1991); Pueblo v. Catán Torres, 117 D.P.R. 645, 652 (1986).
En lo aquí pertinente, la Regla 10 de las Reglas de Evidencia, 32 L.P.R.A. Ap. IV, R. 10, establece que:

“El tribunal o juzgador de hechos deberá evaluar la evidencia presentada, a los fines de determinar cuáles 
*814
hechos han quedado o establecidos o demostrados, con sujeción a los siguientes principios:

(A) El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por ninguna de la partes.

De conformidad con lo anterior, la evidencia presentada por el Ministerio Fiscal deberá contener unos requisitos mínimos. No tan sólo tiene que ser suficiente en derecho, satisfactoria y que produzca certeza o convicción moral en un ánimo no prevenido, sino que a su vez, para que una convicción sea válida, se ha establecido reiteradamente como norma que es necesario que “se prueben todos los elementos del delito imputado y se logre conectar al acusado con ellos”. Pueblo v. Amparo, 146 D.P.R. 467, 487 (1998); Véase, además, Pueblo v. Calderón Álvarez, 140 D.P.R. 627, 643 (1996); Pueblo v. González Román, supra, a las págs. 707-708. La insatisfacción con la prueba es lo que conocemos como “duda razonable y fundada”. Pueblo v. Amparo, supra, a la pág. 487.
Sin embargo, este quántum de prueba no exige que toda duda posible, especulativa o imaginaria tenga que ser destruida. No es necesario establecer la culpabilidad del acusado con certeza matemática. Sólo “se exige prueba que establezca la certeza moral que convence, dirige la inteligencia y satisface la razón”. Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 760-761 (1985).
Reiteradamente, el Tribunal Supremo de Puerto Rico ha establecido que, como cuestión de derecho, la determinación de si fue probada la culpabilidad del acusado más allá de duda razonable, es revisable en apelación; ello así, pues, la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho. Pueblo v. Rivero, Lugo y Almodóvar, 121 D.P.R. 454, 472 (1988). El análisis de la prueba presentada requiere tanto de la experiencia del juzgador como de su conocimiento del Derecho, elementos éstos necesarios para darle a la controversia una solución justa. Pueblo v. Carrasquillo Carrasquillo, 102 D.P.R 545, 552 (1974).
No cabe duda que, en el ejercicio de tan delicada función revisora, no podemos abstraemos de las limitaciones que rigen el proceso de evaluación de la prueba por parte de un tribunal apelativo. Al enfrentarnos a la tarea de revisar cuestiones relativas a convicciones criminales, siempre nos hemos regido por la norma de que la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador, por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando “se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto”. Pueblo v. Maisonave, 129 D.P.R 49, 63 (1991); Pueblo v. Sanabria Pérez, 113 D.P.R. 694, 699 (1983). Sólo ante la presencia de estos elementos y/o cuando la apreciación de la prueba no concuerde con la realidad fáctica o ésta sea inherentemente imposible o increíble, Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 99 (2000) y, casos allí citados, habremos de intervenir con la apreciación efectuada.
III
Primeramente, el apelante invoca- el principio de especialidad para cuestionar su condena por varias infracciones a la Ley de Armas. No le asiste la razón.
El apelante arguye que el Artículo 4.04 de la Ley de Armas “es un tipo especial en relación con el delito del Artículo 4.15 de. la Ley de Armas en cuanto incluye los elementos de este último más el elemento especial de que el apuntar el arma de fuego se realizara como medio para cometer otros delitos, como el asesinato”. Véase, Alegato, folio 72-73. Por su parte, el Procurador General replicó que ambas disposiciones están comprendidas en la misma ley y que versan sobre delitos distintos con elementos diferentes.
Advertimos lo dispuesto en el Artículo 7.03 de la Ley de Armas, el cual claramente dispone, en lo *815 pertinente, que:
Todas las penas de reclusión que se impongan bajo este capítulo serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier ley”. 25 L.P.R.A. § 460b.
Acogemos el planteamiento del Procurador General sobre cómo el citado artículo establece por disposición expresa del legislador que no se aplicará el principio de especialidad a una situación como la de autos. Es decir, por disposición expresa de ley, las actuaciones del apelante infringieron varios artículos de la Ley de Amas y no puede, por ende, tratar sus convicciones como un concurso de delitos. Por tanto, concluimos que las penas impuestas por el Tribunal de Primera Instancia fueron correctamente ordenadas a cumplirse consecutivamente. Sabido es que una ley general no deroga una ley especial a menos que tal derogación se consigne expresamente o esa sea claramente la voluntad legislativa. Sierra v. Tribunal Superior, 75 D.P.R. 841, 847 (1955). Esto es así porque se presume que una ley especial sobre una materia contiene la intención del legislador sobre esa especialidad y debe prevalecer sobre cualquier otro precepto aplicable que sea de carácter general. Pueblo v. Ramos, 92 D.P.R. 607, 610 (1965).
En el presente caso no estamos ante la situación de que una ley especial aplique preferentemente frente a una general. Tampoco estamos ante una situación en que un artículo de una ley especial aplique sobre otro artículo de la ley especial. Como señaláramos, por disposición de ley, los artículos de la Ley de Amas castigan separadamente tantas actuaciones delictivas como se cometan. Ello es así porque se trata de delitos distintos, con elementos diferentes.
Como segundo señalamiento de error, el apelante plantea que:
“[l]a prueba presentada por el Ministerio Público no demostró, mucho menos más allá de duda razonable, que al momento de disparar al grupo de policías, el Sr. Torres, en concierto y común acuerdo con el apelante, albergaba la intención específica de matar, como un designio y propósito final. Del testimonio de los agentes Galarza Valentín y Guzmán Vélez se desprende que la verdadera intención de los disparos consistía en escapar del lugar de los hechos. Ello lo demuestra el hecho de que en cuanto el individuo que disparaba logró esconderse en los condominios que estaban en construcción, los disparos cesaron. Inclusive, surge del testimonio de Miranda Class que la razón por la que se encontraban en la empresa era para escalar la misma y sacar la caja fuerte. Al guardia de seguridad lo iban a amarrar. Por lo tanto, ni de los actos ejecutorios ni de los actos preparativos se desprende que hubo intención de dar muerte”. Véase, Alegato, folio 78.
Nos resulta inimaginable cuál era la intención del apelante al disparar contra un grupo de policías con armas de calibre AK-47. Tirotear a un grupo de policías con armas potentes y no tener la intención de matarlos, sino de ahuyentarlos, para de ese modo poder escaparse, es un argumento fuera de orden, concierto o razón. Nadie puede argüir contra razón y ley que la intención de cualquier ciudadano al disparar un arma de alto calibre contra otro ser humano no sea provocar la muerte de esa persona, o al menos causar grave daño corporal. Como señaláramos anteriormente, el Artículo 15 del Código Penal de 1974 disponía que el delito será intencional: (a) cuando el resultado ha sido previsto y querido por la persona como consecuencia de su acción u omisión, o (b) cuando el resultado, sin ser querido, ha sido previsto por la persona como consecuencia natural o probable de su acción u omisión. 33 L.P.R.A. § 3062. La intención criminal es una condición subjetiva y, como tal, sólo puede descubrirse su existencia por las circunstancias que concurren en el hecho delictivo. Pueblo v. Miranda Ortiz, 117 D.P.R. 188, 194 (1986). La intención criminal puede ser específica o general. Nevares Muñiz, Dora, Derecho Penal Puertorriqueño, Paite General, 3ra. ed., Instituto para el Desarrollo del Derecho, Inc., Hato Rey, 1995, págs. 184-185. Es específica aquella intención cuyo “resultado ha sido previsto y querido por la persona como consecuencia de su acción u omisión”. Art. 15 (a), supra. Hay intención general cuando el resultado *816 delictivo, aunque no fue querido, fue previsto o pudo ser previsto “por la persona como consecuencia natural o probable de su acción u omisión”. Art. 15 (b), supra. Pueblo v. Lucret Quiñones, 111 D.P.R. 716, 740 (1981).
Arguye el apelante que su intención al disparar las armas mortíferas era poder escapar de la escena. Sin embargo, la prueba desfilada ante el tribunal sentenciador demostró que durante el curso de un escalamiento para el cual el apelante llegó armado con armas letales, provocó la muerte a un policía. No podemos concluir que la muerte del agente fue incidental. Tampoco podemos imputar la muerte a conducta alguna del policía, ni a que éste no se percata de que el apelante sólo quería ahuyentarlo. El policía recibió múltiples disparos que le perforaron órganos vitales, que causaron su muerte. Resulta claro inferir que cuando se ataca a una persona con un arma mortífera, debe presumirse la intención de matar. El apelante arguye que “no se configuró la intención requerida para el delito de tentativa de asesinato ”, debido a que no tenía la intención ni sus actuaciones fueron inequivocamente dirigidas a consumar el delito de asesinato. No obstante lo anterior, precisamos, a tenor con los Artículos 26 y 82 del Código Penal de 1974, comete tentativa de asesinato cuando el que “realiza acciones o incurre en omisiones inequivocadamente dirigidas a causar la muerte con malicia premeditada, de un ser humano”. La intención del apelante al portar un arma de alta potencia, y abrir fuego en contra de los policías, justificó las condenas por tentativa de asesinato. El débil argumento de la falta de intención, no merece mayor discusión.
Por último y como tercer error, el apelante alega que fue encontrado culpable con prueba que no estableció su culpabilidad más allá de duda razonable. En apoyo a su posición, aduce que la investigación estuvo plagada de irregularidades, que los testigos del Ministerio Público incurrieron en múltiples contradicciones y que el testimonio de Miranda Class fue la única prueba utilizada para probar los elementos de los delitos y su conexión con el apelante. Tampoco le asiste la razón.
La prueba oral desfilada ante el Tribunal de Primera Instancia, según surge de la transcripción de la evidencia, comienza con el testimonio de la primera testigo de cargo, la señora Daisy Serrano, quien labora como investigadora forense en el Instituto de Ciencias Forenses. Sus funciones... “aparte de ir a la escena, redactar un Informe, hacer un croquis del lugar de los hechos, recoger y embalar toda la evidencia... tomar fotografías y una toma video”. T.E., pág. 19 (Tomo I). Esta testificó que el 5 de noviembre de 2001, a eso de las 12:15 de la noche, acudió al lugar de los hechos en compañía de los investigadores forenses Manuel Camareno y Víctor Pérez. Describió que la escena estaba acordonada y estaba a cargo del teniente Jesús García. La testigo describió el sitio como “un solar yermo, bastante oscuro”. T.E., pág. 27 (Tomo I). En el lugar había “unos furgones, había un carro Suzuki... rojo, había casquillos por todo el lugar de distintos calibres, había unos vagones, debajo de esos vagones había también casquillos. ” T.E., pág. 28 (Tomo I). La testigo tomó doscientas veintidós fotografías, mientras que Pérez filmó un vídeo de la escena y Camareno preparó el croquis. Declaró, además, que tomó fotos en “toda el área, desde el portón... antes del portón... por los vagones... los casquillos... al carro... a los vagones... a la sangre-, a todo”. T.E., pág. 30 (Tomo I).
Las múltiples fotos tomadas por la investigadora forense fueron admitidas como evidencia. T.E., pág. 31 (Tomo I). El contrainterrogatorio a la investigadora forense no reflejó mayores contradicciones. T.E., págs. 18-118 (Tomo I). Las irregularidades planteadas por el apelante son mínimas comparadas con la evidencia efectivamente recopilada en la escena.
La segunda testigo de cargo fue la señora Sandra Torres Colón, viuda del agente Acosta. La testigo declaró que el occiso tenía tres hijos, y que a su vez, le sobrevivieron sus padres y sus cinco hermanos. T.E., págs. 141-144 (Tomo I). La testigo fue quien identificó en el Instituto de Ciencias Forenses el cadáver del agente Acosta. La identificación del occiso se realizó mediante fotos. T.E., págs. 147-148 (Tomo I).
El tercer testigo presentado por el Ministerio Público fue el- policía Geyl Galarza, quien acudió a investigar la querella en compañía del agente Acosta. Este declaró que el 5 de noviembre de 2001, a eso de las 10:00 de la *817 noche, se recibió una llamada a través del sistema 911 en la cual se indicó que había cuatro individuos sospechosos en la zona industrial Corujo, en Bayamón. T.E., pág. 152 (Tomo I). Surge del testimonio que los agentes se dirigieron al lugar en un vehículo confidencial marca Suzuki, color rojo. Testificó el agente que durante el trayecto se les informó que dos individuos se habían bajado de una guagua con una caja y se habían internado en un monte y que la guagua se había marchado del lugar. T.E., pág. 153 (Tomo I). Surge de la transcripción que el agente Acosta estacionó el vehículo en el portón de la entrada de la empresa Empire Gas. T. E., pág. 155 (Tomo I). Antes de desmontarse, los agentes se colocaron sus chalecos a prueba de balas. El agente Galarza declaró lo siguiente:

“[Y]o me bajo por el lado del pasajero con una linterna... como el sitio es oscuro y solitario decidimos sacar las armas. [...] Unas pistolas “Smith & Wesson “modelo cincuenta y nueve...cero...seis...nueve milímetros. [Ejntonces yo le digo... flaco... porque de cariño le decíamos flaco... el foco nos está alumbrando y somos tarjetas [7]... vamos a buscar la orilla de los vagones.

[...]

[A]hí observo... [a dos individuos] que están acostados [debajo de los vagones] uno al lado del otro... con mahones largos... les grito... es la Policía... ahí lo que se oye de allá que dicen es... ”tengan cabrones”... uno de ellos con un rifle largo que lo agarra por debajo del... del cañón... color madera... empieza a dispararle al compañero Acosta y otra arma que hay al lau [sic] que lo que veo es el fogonazo, pues no puedo distinguir qué tipo de arma. Nosotros contestamos el fuego... yo me quedo sin municiones.” T.E., págs. 156, 161, 162, 163 (Tomo I).
Relató el agente que dispararon “hacia donde salía el fuego y donde habíamos visto a los individuos entre el medio de los dos vagones”. T.E., pág. 162 (Tomo I). A su vez, añadió que las dos personas que divisaron dispararon contra ellos “se vieron dos fogonazos...Los dos... uno del rifle y el otro de una pistola que ni pude distinguir...”. T.E.,pág. 162 (TomoI).
El testigo declaró que el agente Acosta se encontraba justamente parado al frente de ellos y como a cinco o seis pies de los individuos. T.E., pág. 163 (Tomo I). Continúa relatando Galarza que gritó “cover” a su compañero y que inmediatamente se refugió al lado del vehículo oficial para recargar su arma de reglamento.
A preguntas del Ministerio Público sobre el hecho de que el agente indicó “que fue al carro”, el agente Galarza testificó que:
“Porque se había quedado el radio portátil... introduzco mi mano izquierda por el cristal del conductor... cuando aprieto el botón del radio... el radio no estaba funcionando... no transmitía... vuelvo a oír detonaciones de un arma larga... cuando me volteo, veo a un individuo alto... de mi estatura o más alto que yo... apuntando hacia mí... hace dos detonaciones nuevamente...con un arma larga... un rifle... yo le contesto con dos detonaciones... [Pjrocedo a cubrirme de la pared de cemento. ” T.E., págs. 165 y 166 (Tomo I).
Galarza llamó desde su teléfono celular pidiendo refuerzos. Surge del testimonio que Galarza vía telefónica le indicó a sus compañeros que existía una emergencia:
“[d]iez cincuenta...esa es la clave cuando es una emergencia...fue a nosotros nos tiraron el flaco...está conmigo creo que le dieron...no lo veo....”. T.E., pág. 166 (Tomo I).
En efecto, los agentes Orlando Guzmán, Melissa Díaz y Noel Reyes llegaron a la escena. Éstos encontraron al agente Acosta tirado en el suelo; según Galarza describió que “procedo a alumbrar con la linterna y veo que hay una persona...tirada en el suelo...cuando alumbro, veo que resplandece lo que dice Policía.” T.E., pág. *818 167 (Tomo I). Describió Galarza que “allí me doy cuenta que era mi compañero.” T.E., pág. 167 (Tomo I). Trasciende que el individuo que les había disparado anteriormente con un rifle le hizo dos detonaciones con una pistola. T.E., págs. 167 y 181 (Tomo I). Según descrito por el agente Galarza:

“Procedo a mirar hacia arriba de la loma...veo un individuo alto...con las mismas características que era el individuo que estaba...que me había disparado... ’’cojiando” hacia los Condominio Primavera... ”

Pregunta: “Cojiando”?
Respuesta: “Sí...se voltea y nos hace dos detonaciones con una pistola...contestamos Orlando Guzmán y yo... repelemos la agresión y el individuo dispara hacia donde estábamos nosotros... llegamos a donde el compañero Acosta...Rey es y yo procedemos a cargar el compañero Acosta, pero que vemos que no tiene su arma de reglamento en sus manos...no está en su vaqueta y no está cerca de él...lo cogemos y lo levantamos... ”. T.E., pág. 168 (Tomo I).
Los agentes regresaron al lugar donde estaba el agente Acosta y lo montaron en una patrulla en el área del pasajero del lado del frente. T.E., pág. 169 (Tomo I). El agente Reyes lo trasladó al hospital. Acosta les decía “Dios los bendiga... por tó [sic] el camino que lo...cargamos”. T.E., pág. 168 (Tomo I). Galarza ocupó un bulto lleno de herramientas. T.E, pág. 170 (Tomo I). Momentos después, la policía arrestó a un individuo “herido con una AK-47... un vagón más abajo donde habían herido a Acosta y que el individuo tenía un chaleco anti balas puesto y estaba herido en una pierna”. T.E., pág. 170 (Tomo I). Éste fue trasladado al hospital. Se trataba de Jorge Miranda Class, coautor de los hechos que se convirtió en testigo principal del Estado.
En la escena, la Policía ocupó las armas de reglamento de los policías Geyl Galarza, Orlando Guzmán y Melissa Díaz (tres pistolas Smith & Wesson, calibre nueve milímetros). “[A] Orlando le quita también el rifle de la Policía (un M-16 de fabricación norteamericana)”. T.E., pág. 170 (Tomo I). Guzmán y Díaz no utilizaron sus pistolas. Trasciende que Guzmán disparó el rifle de la Policía cuando el apelante les disparó desde la lomita). T.E., pág. 309 (Tomo I).
El cuarto testigo presentado por el Ministerio Público fue el Sr. Víctor Pérez, investigador forense del Instituto de Ciencias Forenses y quien filmó un vídeo de la escena. El vídeo fue mostrado a los miembros del jurado. Surge de la transcripción que se pudieron apreciar las condiciones del vehículo confidencial, los cuatro furgones, unas perforaciones de aparente proyectil de bala en uno de los furgones, un sinfín de casquillos de bala disparados, dos bultos con herramientas, manchas de sangre; una gorra tejida, un cargador o magazine con balas y un rifle AK-47. T.E., págs. 388-399 y 431 (Tomo I). El cadáver del agente Acosta mostraba múltiples heridas de bala en las rodillas y una herida de bala en la parte posterior del muslo izquierdo. En el área de la lomita había una mancha de sangre.
El quinto testigo de cargo fue el señor Manuel Camareno, investigador forense del Instituto de Ciencias Forenses y quien preparó el croquis (plano) de la escena. Trasciende que el investigador Camareno estuvo a cargo de la escena como investigador principal. Camareno declaró que el terreno era de dos niveles y que cerca había uña verja de concreto donde había cuatro furgones. El terreno estaba sin asfaltar. T.E., pág. 491 (Tomo II).
El testigo declaró que la escena estaba totalmente oscura y que no se veía prácticamente nada. T.E., pág. 488 (Tomo II). Específicamente; el testigo describió que tuvieron que iluminar la escena, debido a que “estaba oscura... tuvimos que encender la planta de nosotros y solicitar los servicios de la Defensa Civil y la colocamos más arriba para iluminar la escena completa”. T.E., pág. 488 (Tomo II). Se ocuparon varios casquillos de bala debajo de uno de los furgones. T.E., pág. 488 (Tomo II). Uno de éstos tenía tres impactos de bala. Se ocupó un rifle AK-47 detrás de uno de los furgones. Detrás del vehículo confidencial, también se ocuparon varios *819 casquillos de bala de diferentes calibres. Se recuperaron cincuenta y cinco casquillos de bala. También se recuperó un bulto con herramientas. T.E., pág. 527 (Tomo II).
Trasciende de la transcripción que luego de haber recolectado toda la evidencia, el investigador Camareno ocupó un chaleco a prueba de bala, un mahón negro y cuatro armas de fuego, las armas pertenecientes a los agentes Geyl Galarza, Orlando Guzmán y Melissa Díaz y un rifle M-ló de la Policía. El chaleco y el mahón pertenecían a Miranda Class. Luego, el investigador Camareno se dirigió al hospital para examinar el cadáver del agente Acosta y la patrulla en la que fue trasladado.
Como parte del contrainterrogatorio, Camareno testificó que el personal del Instituto acordonó el área. También declaró que en “la lomita” no se encontraron casquillos de bala. Había casquillos calibre nueve milímetros detrás de la mancha de sangre que estaba alrededor del cuerpo del occiso. Cerca del vehículo del agente Acosta, se encontraron diez casquillos calibre dos veintitrés- éste es el calibre del rifle M-16-, además de doce casquillos de bala nueve milímetros. Camareno declaró que en la escena no se encontró un peine vacío nueve milímetros.
El sexto testigo de cargo fue el teniente Jesús M. García. Surge de la trascripción que el teniente era el oficial policíaco con mayor rango dentro de la jerarquía de la Policía de Puerto Rico. Ante ello, el teniente García estuvo a cargo de la escena. T.E., pág. 678 (Tomo II). El teniente declaró que el 5 de noviembre de 2001, la Policía recibió una llamada por radio que indicaba que había unos compañeros en Bayamón Norte solicitando refuerzo y que había un compañero herido. T.E., págs. 677 y 679 (Tomo II). El teniente llegó al lugar de los hechos a eso de las 10:30 de la noche en compañía del agente Rivera. Sobre la descripción de la escena, el teniente precisó que “era de noche y que lo que había era la luz de la luna”. T.E., pág. 682 (Tomo II). Llegaron otros policías estatales y municipales. “Estaban en el área... nosotros nos regamos... y procedimos a hacer la búsqueda... de las personas que habían atentado contra el guardia". T.E., pág. 679 (Tomo II). Trasciende que el teniente impartió instrucciones “para que no hubiese otro incidente entre los mismos agentes en la oscuridad”. T.E., pág. 716 (Tomo II). Según el relato del teniente, el vehículo de Acosta tuvo que ser empujado hacia el frente para que las patrullas pudieran entrar al lugar de los hechos. Además, declaró que “entrarían como unas cinco o seis patrullas que las regamos en el área para alumbrar”. T.E., pág. 684 (Tomo II).
La defensa le preguntó al teniente: “¿ Verdad que eso no es una práctica adecuada pasarle por encima a evidencia que hay en la escena?”. El testigo contestó: “Definitivamente no...”. T.E., pág. 730 (Tomo II). El teniente declaró que: “[U]nos treinta o cuarenta y cinco minutos después... se localiza detrás de unos vanes... se arresta a una persona”. T.E., pág. 685 (Tomo II). Al lado de éste- a menos de un pie-, se ocupó un rifle AK-47 y un cargador. T.E., págs. 685, 686, 722 y 752 (Tomo II). También se le ocupó un chaleco antibalas. T.E., pág. 688 (Tomo II). El sujeto estaba herido en uno de los glúteos y vestía un mahón color negro -el cual según relato del teniente fue ocupado por instrucciones del fiscal y entregado al Instituto de ciencias Forenses como evidencia- ya que la pieza de ropa tenía abundante sangre. T.E., pág. 687 (Tomo II). El sujeto arrestado se trataba de Miranda Class.
El teniente ocupó las armas de fuego de los agentes interventores con el propósito de ser sometidas a un análisis de balística. No se encontró la pistola del agente Acosta. El teniente García rindió un informe en este caso.
El séptimo testigo de cargo fue el teniente Edilberto Rivera. Según el relato del teniente, se trasladó a la escena tan pronto ocurrió el incidente. T.E., pág. 772 (Tomo II). No obstante, precisó que al llegar a la escena ya habían llegado tanto el teniente García, como varios agentes de la policía. T.E., pág. 772 (Tomo II). Surge del testimonio del teniente que cuando llega a la escena, Miranda Class ya había sido arrestado y trasladado al hospital. T.E., pág. 799 (Tomo II).
*820 El teniente Rivera regresó a la escena al día siguiente, el 6 de noviembre de 2001, porque “temamos una información de que había un arma en ese lugar”. T.E., pág. 774 (Tomo II). La información la proveyó Miranda Class. T.E., pág. 778 (Tomo II). El teniente Rivera encontró la pistola del agente Acosta “entre medio” de las gomas de uno de los vagones. T.E., pág. 777 (Tomo II). La pistola no tenía municiones. Rivera le entregó el arma al agente Yarwin Alvarado, el agente a cargo de la investigación del caso. T.E., pág. 778 (Tomo II).
El octavo testigo de cargo fue el sargento Aníbal Vázquez. Este testigo declaró que dos días después de los hechos, el 7 de noviembre de 2001, se trasladó a la escena. “[Hlicimos una búsqueda... en esos edificios en construcción y en uno de los baños... que estaba tapado con un panel, había un chaleco antibala estático color azul... con unas letras en el lado superior derecho que leían Policía y la serie era 000723-83-A. [...] [H]abía unos guantes... desechables [plásticos]”. T.E., págs. 811 y 812 (Tomo II). El edificio quedaba al frente del lugar donde fue abatido el agente Acosta. El testigo declaró que el chaleco y los guantes se le dieron al agente Varwin Alvarado, el agente a cargo de la investigación del caso. T.E., pág. 825 (Tomo II).
El chaleco fue presentado como prueba en el juicio. Vázquez declaró que el chaleco era parecido, pero no tenía el mismo número de serie que él estaba mencionando”. T.E., pág. 827 (Tomo II). El Ministerio Público le preguntó: “¿No es el mismo que usted ocupó?” El testigo contestó: “No, señor”. T.E., pág. 828 (Tomo II). La serie de este chaleco era 0071941-A. El tribunal recesó en sala por quince minutos. Al reanudarse la sesión, el Ministerio Público indicó que el chaleco en cuestión tenía dos números de series. Solicitó que se llamara nuevamente al testigo para que aclarara este aspecto. T.E., pág. 832 (Tomo II). Sobre el incidente, el Ministerio Público, específicamente, explicó que:

“[eJncontramos un número de serie es el que el testigo a (sic) mencionado que el chaleco que él ocupó que es el número de serie 00072383-A, eso él lo declaró aquí durante el proceso, le pedimos al testigo señoría que no se retirara porque entendíamos que había aparecido un número aparentemente un chaleco que tiene dos números de serie en el mismo y pedimos al Tribunal y al Señor Juez que permita que el testigo aclare esto ante la presencia de los jurados para ver si él puede identificar. ”

El juez examinó el chaleco y efectivamente tenía dos números de series (números 000723-83-A Y 0071941-A). T.E., pág. 833 (Tomo II).
El abogado del apelante se opuso a que se llamara nuevamente al testigo. El abogado de Héctor Torres Vega también se opuso. El Juez le preguntó a los abogados de la defensa que si ellos pudieron ver en el chaleco los dos números de serie: el 00071941-A, que fue el que el testigo declaró, y el 00072383-A en el otro extremo del chaleco. Los abogados respondieron: “Eso es así”. T.E., pág. 837 (Tomo II).
El Juez aclaró que los números de series no estaban puestos a mano ni a tinta, sino que era un sello “impreso” que venía de fábrica. Los abogados defensores contestaron: “Eso es así’. T.E., pág. 838 (Tomo II). El fiscal aclaró que la defensa conocía de antemano que el chaleco tenía dos números de series porque lo había examinado en la Fiscalía de Bayamón. T.E., pág. 840 (Tomo II). El tribunal decidió llamar nuevamente al testigo para que aclarara ante el jurado que el chaleco tenía dos números de series.
El sargento Vázquez volvió a examinar el chaleco y declaró que “en el lado izquierdo del chaleco...hay un número de serie 0072383-A, que es el que corresponde al que yo mencioné anteriormente”. T.E., pág. 845 (Tomo II). La defensa le preguntó: “¿[QJuién fue donde usted y le dijo que había encontrado el número de serie correspondiente a ese chaleco?”. El testigo contestó: “Nadie me lo dijo”. T.E., pág. 851 (Tomo II). El chaleco fue admitido en evidencia sin objeción de la defensa. (Exhibit 31 del Ministerio Público).
El noveno testigo presentado por el Ministerio Público fue el agente Varwin Alvarado, agente a cargo de la investigación del caso. Este declaró que la escena era “justamente detrás de empresas de gas, donde estaban los *821 tanques de gas propano...en el Industrial Corujo en Bayamón en Hato Tejas”. T.E., págs. 857-858 (Tomo II). El agente declaró que cuando llegó a la escena, Acosta y Miranda Class ya habían sido trasladados al hospital. El agente testificó que estuvo junto con los investigadores del Instituto de Ciencias Forenses durante “la recolección de toda la evidencia”. T.E., pág. 864 (Tomo II). La evidencia recolectada fueron casquillos, proyectiles, armas de fuego, sangre y chaleco a prueba de balas. T.E., pág. 864 (Tomo II). Declaró que Camareno ocupó parte de las herramientas porque entendía “que era suficiente para los análisis (de huellas)”. T.E., pág. 869 (Tomo II). Los bultos y las herramientas fueron admitidos en evidencia por estipulación de las partes.
El testigo Alvarado también testificó que examinó el cadáver del agente Acosta en el área de patología del Hospital Hermanos Meléndez y que éste “presentaba varios impactos de balas con una concentración mayor en las piernas”. T.E., pág. 921 (Tomo II). Testificó que al cadáver le tomaron fotografías, video y datos. T.E., pág. 921 (Tomo II). Declaró el agente que del hospital se dirigió “para ver la condición” de Miranda Class, quien estaba en la Sala de Emergencias del Centro Médico. T.E., pág. 922 (Tomo II). Alvarado fue a visitarlo en horas de la mañana en compañía del policía Ramos. Le hizo las advertencias de ley. T.E., pág. 1030 (Tomo II). No pudo entrevistarlo porque le estaban curando la herida. T.E., pág. 946 (Tomo II). Miranda Class se quejaba de dolor, pero no estaba sangrando. “No estaba alterado”, declaró Alvarado. T.E., pág. 1043 (Tomo II). Sólo decía que “se encontraba sentido y que quería hablar”. T.E., pág. 1118 (Tomo II).
Alvarado regresó en la tarde en compañía de los fiscales Jesús Peluyera y Francisco González, de una taquígrafa y del sargento Munich. Miranda Class les admitió “que él había participado en los hechos que había ocurrido en el Industrial Corujo junto con otras dos (2) personas”. T.E., pág. 941 (Tomo II). Se le tomó una declaración jurada ese mismo día, 6 de noviembre de 2001.
El agente Alvarado precisó que Miranda Class “contestaba rápido y seguro”. T.E., pág. 956 (Tomo II). Miranda Class “[y]a estaba más tranquilo, ya no se quejaba de la herida mucho [e] indicó que se sentía deprimido". T.E., pág. 947 (Tomo II).
La defensa le preguntó a Alvarado: “¿Si [Miranda Class] se encontraba en su[s] plen[a]s facultades y sentidos cuando prestó la Declaración usted lo desconoce, verdad que sí?”. El testigo contestó: “Por mi apreciación estaba bien”. T.E., pág. 1038 (Tomo II). Al día siguiente Miranda Class firmó la declaración jurada.
Alvarado llevó el arma del agente Acosta al Instituto de Ciencias Forenses. Éste declaró que no se pudieron detectar huellas en el arma. T.E., pág. 1046 (Tomo II).
El décimo testigo del Ministerio Público fue el señor Anthony Matías, químico del Instituto de Ciencias Forenses. Éste examinó el chaleco a prueba de bala del agente Acosta, el cual presentaba tres orificios al frente. También examinó el mahón de Miranda Class. “Determin[ó] la presencia de recibo de disparo en los tres orificios del chaleco... y en uno de los orificios del pantalón y debajo del área de la rodilla”. T.E., págs. 1160, 1164 y 1169 (Tomo III). El chaleco fue traspasado por dos impactos de bala y no tenía orificios de bala “en el área del cuello”. T.E., pág. 1169 (Tomo III). No se encontró “residuo de disparo” en la parte superior del pantalón, específicamente en el área del bolsillo delantero. El testigo aclaró: “[Y]o he tenido varios casos que tengo los orificios que sé que traspasa, pero no tengo ningún tipo de evidencia física como plomo o cobre para decidir que sí”. T.E., pág. 1171 (Tomo III). La defensa le preguntó al testigo: “¿[S]i la persona que vestía este pantalón (Miranda Class) hubiese sido herido por este orificio... si en esa área debió haber habido sangre?” El testigo contestó: “[Y]o diría que la mayoría de los casos tienen sangre. [...] Yo he tenido otros casos que no me presentan sangre y sé que son heridas porque hasta la persona ha sido... o sea está muerta”. T.E., págs. 1172-1173 (Tomo III).
*822 El testigo declaró que el orificio que aparece en el bolsillo del pantalón de Miranda Class no tiene orificio de salida. T.E., pág. 1173 (Tomo III). La defensa preguntó: “¿[E]sa persona debió tener una herida... sin salida?”. El químico contestó: “[Y]o tengo varios casos... que a veces entra por aquí, choca con un y la salida se produce abajo... puede producirse arriba... o sea la salida puede producirse por cualquier lado". T.E., pág. 1173 (Tomo El).
El undécimo testigo presentado por el Ministerio Público fue el Sr. José Rojas Ayala, guardia de seguridad de las oficinas de Empire Gas. Este declaró que “como a las diez de la noche se escucharon unas ráfagas de detonaciones bastante fuertes... luego como a los cinco segundos otra ráfaga bastante extensa. Las detonaciones de la segunda ráfaga eran de un sonido “más flojo”, como de (calibre) nueve o cuarenta más o menos”. T.E., págs. 1198-1199 (Tomo III). “Como al minuto”, escuchó las sirenas de la Policía. T.E., pág. 1200 (Tomo III). El testigo abrió el portón de las facilidades para que la Policía entrara al lugar. El testigo se percató de que una parte de la verja eslabonada de serpentina “estaba picada”. T.E., pág. 1212 (Tomo III). “[Y]o la había chequeao como a las nueve de la noche y todo aquello estaba bien”. T.E., pág. 1234 (Tomo III).
El duodécimo testigo de cargo fue el señor William Rodríguez, gerente de operaciones de Empire Gas, donde trabaja hace 30 años. Este declaró que la planta de operaciones queda en la Urbanización Industrial Corujo, en Bayamón; que tiene cinco cuerdas de terreno y que todo está cercado con verja de cemento de 6 pies con serpentina arriba en la parte de atrás y en la parte del frente con verja de “cyclone fence”. T.E., pág. 1239 (Tomo III). La planta tiene una oficina de contabilidad. Relató que en la referida oficina había una caja de seguridad donde se guarda el dinero. T.E., pág. 1248 (Tomo III).
El decimotercer testigo del Ministerio Público fue el agente Orlando Guzmán. Éste declaró que el 5 de noviembre de 2001 se encontraba en compañía de los agentes Noel Reyes y Melissa Díaz, dando una ronda preventiva. El testigo llevaba chaleco y un rifle M-16. Declaró que “a eso de las diez... sale una llamada que el centro de mando envía a través del nueve once (911) que indica que habían [sicj cuatro individuos sospechosos en el área Industrial Corujo... por donde está el Empire Gas”. T.E., pág. 1256 (Tomo III). “[L]a compañera Jacqueline Acevedo indica por radio que se va acercar al lugar... a verificar”. T.E., pág. 1256 (Tomo III). Los agentes también se dirigieron al lugar. Cuando están llegando por la parte del frente de Empire Gas, llegaron en cinco minutos, aproximadamente, la agente Acevedo indica que “escuchó unas detonaciones”. T.E., pág. 1258 (Tomo III).
El testigo ya estaba frente a la planta de Empire Gas. “[E]n ese mismo momento entra una llamada por vía celular del agente Noel Reyes”. T.E., pág. 1258 (Tomo III). Era el agente Galarza. Éste le dijo a Noel que era un “diez cincuenta”, código que significa emergencia de vida o muerte, y que Acosta “podía ser que estaba herido”. T.E., pág. 1261 (Tomo HI). Galarza le hizo una señal con una linterna. T.E., pág. 1262 (Tomo III). Los agentes entraron en el carro patrulla. El lugar estaba muy oscuro. T.E., pág. 159 (Tomo I).
Buscaron con la linterna por el área de los vagones y encontraron al agente Acosta tirado en el suelo. El testigo declaró que se veía de la cintura para abajo mucha sangre. T.E., pág. 1270 (Tomo III). Galarza “rápido alumbra hacia arriba... por donde está una lomita... ve una persona (de seis pies aproximadamente) que va corriendo. [S]e veía cojeando”. T.E., pág. 1267 (Tomo III). Este sujeto se viró y les hizo dos detonaciones. “[Pjodría ser [con] una pistola o un revólver... algo pequeño”. T.E., pág. 1316 (Tomo III).
Los agentes contestaron el fuego. Guzmán le disparó al sujeto alto con el rifle en diez (10) ocasiones. El sujeto se escondió. Los agentes pudieron observar al sujeto porque para el lado del Condominio Primavera “allá... estaba alumbrao... y él iba hacia allá y se ve”. T.E., pág. 1381 (Tomo III). Acosta estaba mal herido. No tenía su arma de reglamento. El agente Noel Reyes lo llevó al hospital. Acosta iba en el asiento del frente, al lado del chofer. Tenía su chaleco puesto. En ese momento llegaron varias patrullas.
*823 El decimocuarto testigo de cargo fue el agente Luis Rivera Pagán. Éste testificó que el 5 de noviembre de 2001 se encontraba en compañía del teniente Jesús García y del agente Edwin Rodríguez, dando una ronda preventiva. A eso de las diez y quince de la noche se recibió un “diez cincuenta” (10-50) en la Urbanización Industrial Corujo, en Bayamón. Ya habían llegado al lugar un sinnúmero de agentes de la Policía. Se realizó una búsqueda porque, según se informó, “posiblemente... los individuos que habían iniciado el tiroteo se encontraban en el área’’. T.E., pág. 6 (Tomo IV).
El testigo declaró que al cabo de media hora, por “la verja que da a la empresa Empire Gas”, “un sargento... tropieza con algo, cuando tropieza pues se queja y era un individuo que estaba detrás de los vanes (era Miranda Class)’’. T.E., págs. 8 y 28 (Tomo IV). El testigo lo cogió por el área de la cintura y lo arrastró hasta un lugar donde había más visibilidad. Su testimonio fue el siguiente:

“[Cjuando voy sacándolo... yo le pregunto que si andaba solo y me dijo que andaba con dos más y le procedo a preguntar que me diga los nombres y me dice que... que no que si le consigo una ambulancia él me da toda la información que yo le... pida porque está herido, cuando yo verifico... levanto el suéter, pues él tenía un chaleco a prueba de balas puesto. Me percato que en el lado izquierdo a nivel de la cadera y el muslo (glúteo izquierdo)pues tenía sangre... hago las gestiones con... los compañeros que llamen la ambulancia.

Llega la ambulancia..., y le hago las advertencias de ley porque como estaba bastante oscuro no se podía leer. [L]e pregunto los nombres y me dice que él no conoce los nombres de las personas que andaban con él. [M]e indicó que él se llamaba..., Jorge Miranda Class. [E]l me indica que los (apodos) de los que andaban con el... “Prieto” y “Tostón”. Le pregunto si estaban armados y me dice que sí..., dos pistolas y un arma larga, rifle. ”

T.E., págs. 8-10 (Tomo IV).
Debajo del cuerpo de Miranda Class se ocupó un rifle AK-47. T.E., pág. 14 (Tomo IV). Fue trasladado al Centro Médico.'El testigo iba junto a él en la ambulancia. Miranda Class le manifestó que tenía miedo “por sus familiares”. T.E., págs. 84-87 (Tomo IV). “[M]e indicó que el tal “Tostón” (el coacusado Torres Vega) tenía ...vínculos con policías del Cuartel de Vega Baja y lo podían llamar, notificar y ocasionarle daño a su familia. ” T.E., pág. 87 (Tomo IV). Al día siguiente, el testigo se reunió con el agente Alvarado y le informó todo lo que Miranda Class le había manifestado.
El decimoquinto testigo de cargo fue el Teniente Sergio Calderón, Director de la Unidad de Arrestos Especiales del CIC. El testigo conocía de antemano al coacusado Torres Vega porque habían sido compañeros de trabajo en la Uniformada. Surge que el 6 de noviembre de 2001, el teniente Calderón arrestó al coacusado Torres Vega en Dorado y que éste no ofreció resistencia. El teniente relató que el coacusado solicitó a Calderón que “no dejes que me den porque estoy herido”. T.E., pág. 107 (Tomo IV). Tenía una herida en la pierna izquierda, “[Tjenía mal olor aparentemente la sangre estaría podría [sic]”. T.E., pág. 107 (Tomo IV). “[P] arecía una herida de bala. ” T.E., pág. 109 (Tomo IV).
El decimosexto testigo del Ministerio Público fue Jorge Miranda Class, alias Pito, quien estaba acusado por los mismos hechos. Anteriormente, había sido convicto y sentenciado por robo y apropiación ilegal. Miranda Class conocía al apelante Santiago Morales por Prieto y al coacusado Héctor Torres Vega por Tostón.
Miranda Class testificó que el 5 de noviembre de 2001, a eso de las seis de la tarde, el testigo se encontraba en su residencia en Vega Baja y los acusados fueron a buscarlo para realizar un escalamiento en las oficinas de Empire Gas. Los acusados llegaron a su casa en una guagua tipo pick-up color verde conducida por el coacusado Torres Vega. Luego, a eso de las siete de la noche, se reunieron con un empleado de la empresa, cuyo nombre no ofreció. Éste les informó que en la caja fuerte había alrededor de “treinta o sesenta mil *824 dólares". T.E., pag. 152 (Tomo IV).
Miranda Class declaró que los acusados se trasladaron a la Urbanización Industrial Corujo, en Bayamón. Estuvieron estudiando el sitio como una o dos horas. T.E., pág. 153 (Tomo IV). Entraron al área por el “cyclone fence", “por el área que estaba el vehículo”. T.E., págs. 661-662 (Tomo V). El plan era “llegar por detrás de la compañía, escalar el sitio, pegar al guardia de seguridad, entrar a la oficina y sacar la caja fuerte”. T.E., pág. 154 (Tomo IV). El testigo declaró que el coacusado Torres Vega le iba a pegar al guardia de seguridad y a velar para que nadie más se enterara de lo que estaban haciendo. T.E., pág. 163 (Tomo IV). El apelante Santiago Morales iba a ayudar al coacusado Torres Vega, a “velarle la espalda”. T.E., pág. 163 (Tomo IV). El testigo iba a entrar a la oficina por una ventana que iba a romper con las herramientas que llevaba. T.E., pág. 205 (Tomo IV).
El Ministerio Público le preguntó al testigo: “¿Con qué iban a hacer eso, entrar por una ventana?”. Miranda Class contestó: “Con uña de gato, el grinder pa['] picar hierro, alicates, cortafríos y ya eso”. T.E., págs. 155-156 (Tomo IV).
Miranda Class declaró que las herramientas estaban dentro de un bulto en la pick-up. T.E., págs. 156-157 (Tomo II). El testigo identificó en Sala el bulto y las herramientas. Su testimonio fue el siguiente:
“Empezamos a escalar el sitio, entrando por la parte oscura y detrás de la empresa... cargaron el bulto con las herramientas, Héctor y Luis, refiriéndose a los coacusados, al llegar a la pared de la empresa Empire Gas... Empecé yo a picar la verja serpentina de la pared y cuando estaba acabando de picar la... Llegaron los guardias. Dejé de picar la verja y me quería ir. [...] Me metí detrás del vagón. [...] Los guardias estaban rebuscando... y encontró a nosotros [sic] ahí. [...] Se formó un tiroteo. Pregunta: ¿Quién inició el tiroteo? Respuesta: Héctor Torres [el coacusado]. [...] Con el rifle. ElAK-47. ” T.E., págs. 164-173 (Tomo IV).
El coacusado Torres Vega estaba “frente afrente con los guardias“como de cuatro a seis pies” y “detrás de la pared de la empresa de gas”. T.E., págs. 200-201 (Tomo IV). El testigo estaba “eñangotao”. T.E., pág. 211 (Tomo II). El apelante Santiago Morales estaba al lado de Torres Vega. Santiago Morales portaba una ametralladora. T.E., pág. 181 (Tomo II). El testigo no recuerda si Santiago Morales disparó. Miranda Class portaba una pistola nueve milímetros. “Yo la saqué del bulto”. T.E., pág. 180 (Tomo II). Miranda Class declaró que él no disparó. T.E., pág. 199 (Tomo IV). El testigo se encontraba “como de tres a cuatro pies” de los acusados. T.E., pág. 201 (Tomo IV).
Miranda Class recibió un balazo en la cadera izquierda. T.E., pág. 209 (Tomo IV). Anteriormente, había dicho que fue en un glúteo. Cuando se le cuestionó, aclaró lo siguiente: “Cuando recibí el tiro, sentí que... me dolía como si fuera en la nalga”. T.E., pág. 633 (Tomo V). El testigo le mostró al jurado el lugar donde recibió el impacto (en la cadera). T.E., pág. 636 (Tomo V). Miranda Class comenzó a “gatear” por debajo de los vagones.
Los acusados se quedaron “rebuscando” a uno de los guardias que estaba “acostado en el piso”. T.E., págs. 216 y 217 (Tomo IV). El testigo vio al coacusado Torres Vega coger la pistola del guardia, que estaba en el piso. T.E., pág. 219 (Tomo IV). Miranda Class fue quien la botó posteriormente. T.E., pág. 467 (Tomo IV). El testigo también declaró que le devolvió la pistola a Torres Vega. T.E., pág. 467 (Tomo IV). El otro agente “ya no se encontraba en ese sitio”. T.E., pág. 218 (Tomo IV). Cuando iba “saliendo del vagón”, el coacusado Torres Vega le “tir[ój el rifle” [AK-47] a Miranda Class. T.E., pág. 219 (Tomo IV). El rifle cayó como a “tres pies” de distancia de su cuerpo. T.E., pág. 220 (Tomo IV). El rifle “se detonó una vez más”. T.E., pág. 220 (Tomo IV). El testigo escondió el rifle “debajo del tubo plástico negro”. T.E., pág. 222 (Tomo IV).
Miranda Class no volvió a ver a los acusados. El coacusado Torres Vega se fue “como brincando de una *825 pierna". T.E., pág. 227 (Tomo IV). Le preguntaron al testigo: “¿Usted sabe porqué le tiraron ese rifle a usted?” El testigo respondió: “Porque ése fue el que mató al oficial”. T.E., pág. 221 (Tomo IV). El testigo declaró que se escondió debajo de unos tubos y que tenía temor de que lo fueran a matar a él. T.E., pág. 221 (Tomo IV). A la pregunta de porqué tenía temor, Miranda Class contestó: “Porque en esos momentos le huye [sic] como se estaba formando un tiroteo y a mi cre[e]ncia yo abandoné a ellos”, T.E., pág. 222 (Tomo IV).
La Policía encontró a Miranda Class. Éste vestía un mahón negro y llevaba un chaleco a prueba de bala. Miranda Class fue trasladado al Centro Médico. Éste fue entrevistado por varios agentes de la Policía. Al día siguiente, Miranda Class fue entrevistado por el agente Alvarado, agente a cargo de la investigación del caso. Surge de autos que el agente Alvarado estaba acompañado por dos fiscales. Miranda Class estaba en una camilla; le habían puesto un suero y un paño “para aguantar la sangre”. T.E., pág. 238 (Tomo IV). Fue operado una semana después. Los fiscales le hicieron varias preguntas y él las contestó. Le preguntaron al testigo: “¿Y porqué es que usted llega a entrevistarse con los fiscales y el agente Alvarez? Miranda Class contestó: “Porque quería declarar voluntariamente”; “porque quería de saber claro [sic] que yo no fui el que mató al oficial”. T.E., pág. 239 (Tomo IV). Miranda Class se declaró culpable por estos hechos a cambio de una sentencia benigna. T.E., pág. 255 (Tomo IV).
Miranda Class prestó dos declaraciones juradas: una para las autoridades locales y otra para las autoridades federales. Durante el contrainterrogatorio, Miranda Class declaró que los agentes no le hicieron las advertencias de ley. T.E., pág. 500 (Tomo IV). Éste declaró que el agente Alvarado tampoco se las hizo. T.E., pág. 501 (Tomo IV). Los agentes de la policía declararon lo contrario. El testigo negó que hubiese tenido problemas con el apelante Santiago Morales por causa de una mujer y negó conocer a una mujer de nombre Katiria. Declaró que sabe dónde vive el apelante y que sabe llegar a casa de él. T.E., pág. 571 (Tomo V).
El decimoséptimo testigo del Ministerio Público fue la doctora Yocasta Brugal Mena, patóloga del Instituto de Ciencias Forenses. La doctora testificó que el 6 de noviembre de 2001 le practicó una autopsia al cadáver del agente Acosta. Éste mostraba nueve heridas de bala. Una de las heridas (A) se encontraba en el lado izquierdo del tórax, en una dirección de abajo hacia arriba, de delante hacia atrás y de izquierda a derecha con salida en la parte posterior del cuello. T.E., págs. 678 y 679 (Tomo V). Este proyectil perforó el pulmón izquierdo. T.E., pág. 679 (Tomo V). La herida B se encontraba en el abdomen. No tenía salida. “Llevaba una dirección de abajo hacia arriba y de izquierda a derecha”. T.E., pág. 680 (Tomo V). Esa herida “no produjo ningún daño vital”. T.E., pág. 682 (Tomo V). La herida C se encontraba en el muslo izquierdo, en la parte posterior. T.E., pág. 682 (Tomo V). La trayectoria era de atrás hacia delante, de izquierda a derecha y de abajo hacia aniba. T. E., pág. 685 (Tomo V). Este proyectil “laceró la arteria y la vena femoral izquierda y produjo una hemorragia extensa”. T.E., pág. 686 (Tomo V). La testigo declaró que éstos “son dos vasos importantes”. T.E., pág. 686 (Tomo V). La herida D se encontraba en la parte posterior del muslo derecho. Con trayectoria de atrás hacia delante, ligeramente de izquierda a derecha y de abajo hacia aniba. T.E., pág. 691 (Tomo V). La herida E se encontraba detrás de la rodilla izquierda, con trayectoria de atrás hacia delante, de derecha a izquierda y de abajo hacia arriba, a 19 pulgadas del talón. T.E., pág. 696 (Tomo V). La herida F se encontraba en la rodilla derecha, con trayectoria de delante hacia atrás, de izquierda a derecha y de abajo hacia arriba. T.E., pág. 699 (Tomo V). La herida G se encontraba en la parte posterior de la pierna derecha, con trayectoria de atrás hacia delante y de abajo hacia arriba. La herida H se encontraba en la paite del frente de la pierna derecha, con trayectoria de delante hacia atrás y de abajo hacia arriba. T.E., pág. 701 (Tomo V). La herida de bala I se encontraba en el pie izquierdo, con trayectoria de delante hacia atrás. La patóloga recuperó dos proyectiles disparados completos, un plomo, dos fragmentos de blindaje, dos fragmentos de plomo y blindaje, uno de éstos se ocupó en la ropa del occiso. Toda esa evidencia fue sometida al análisis de balística. T.E., pág. 704 (Tomo V).
Todas las heridas eran compatibles con disparos de una distancia de más de dos pies. Todas ellas también tenían en común que eran de abajo hacia arriba. T.E., pág. 710 (Tomo V). La opinión de la patóloga es que “la *826 persona que recibe los disparos estaba más alta o más por encima de las personas que le hacen los disparos”; “por las heridas de las piernas parecen estar prácticamente bien abajo del, o sea podrían estar en el piso ”. T. E., pág. 720 (Tomo V). Lo que no tienen en común las heridas es que algunas son de izquierda a derecha y otras son de derecha a izquierda; algunas son de atrás hacia el frente y otras del frente hacia atrás. T.E., págs. 710 y 725 (Tomo V).
La patóloga concluyó que la muerte fue por homicidio o sea “cuando otra persona le causa la muerte a otro ser humano”. T.E., pág. 712 (Tomo V). La causa de muerte fue “la perforación y laceración de órganos internos debido a heridas de bala, más específicamente la perforación de órganos internos y la laceración de la arteria y vena femoral izquierda”. T.E, pág. 710 (Tomo V). Se refiere a las heridas A y C. “Ésas son las únicas que producen daño vital”, declaró. T.E., pág. 710 (Tomo V). Se recuperó el proyectil que causó la herida C; no así el que causó la herida A. La patóloga declaró que “cualquiera de las dos [heridas] podrían ser causa de la muerte, pero como tenía las dos, entendemos que las dos contribuyeron ada muerte”. T.E., pág. 727 (Tomo V).
La trayectoria de la herida A es del frente hacia atrás y de abajo hacia arriba. La trayectoria de la herida C es de atrás hacia el frente y de abajo hacia arriba. La patóloga contestó en la afirmativa cuando la defensa le preguntó si “la persona que produce ese disparo al cuerpo de Carlos Acosta Rey estaba a espaldas de él y en un plano más bajo que él”. T.E., pág. 727 (Tomo V). Esta persona (la que provoca la herida C) tenía que estar “arrodillado o estaba en el piso”, “porque la herida viene de abajo hasta la nalga”, declaró la testigo. T.E., pág. 737 (Tomo V).
En cuanto a los proyectiles que el occiso recibió por la espalda, la patóloga contestó, a preguntas de la defensa:
“El cadáver tuvo que haber recibido uno, unas heridas de bala en la espalda, obligatoriamente van de atrás hacia delante, no sabemos de espalda quién, ni en qué, cómo estaba en que momento, pero lo cierto es que recibe una, unas heridas de bala en la parte de atrás y unas heridas de bala en la parte anterior, lo cual quiere decir, o que estaba recibiendo disparos de diferentes direcciones o que el cadáver se movió o que el cadáver se cayó y entonces recibió otros impactos en una posición a la que cae, a la que estaba de pie. ” T.E., págs. 732 y 734 (Tomo V).
El Ministerio Público le preguntó a la testigo: “Entonces no es incompatible... que todos los tiros hayan venido del mismo lugar, que todos hayan venido de abajo hacia arriba y que el movimiento fue el de Acosta buscando protección y moviéndose en la escena, cuando recibe todos esos impactos que recibió. ¿Eso es correcto? No es incompatible”. La patóloga contestó: “No es incompatible”. T.E., pág. 755 (Tomo V).
A preguntas de la defensa, la patóloga declaró que la víctima podía disparar. Explicó que cuando ella se refiere a órganos vitales, se refiere al corazón y al cerebro, que si son atravesados, hacen que la vida cese de forma inmediata. Pero si se atraviesa un pulmón o una arteria, se puede aún disparar “porque como vimos, el pulmón da tiempo a sangrar mil cc, eh, ese pulmón se colapsa, pero eso no quiere decir que la persona muere, eh, por esa, herida, porque si a esa persona llegan a ponerle un tubo de pecho y el pulmón se expande, no pasa nada”. T.E., pág. 756 (Tomo V). Se le pidió que determinara cuál de las dos heridas (A y C) “pudo haber provocado la muerte primero”. La patóloga contestó: “Las dos a la vez. [■■■] Un pulmón deja de funcionar... va a dar una insuficiencia respiratoria, pero también está sangrando por la herida que tiene en la femoral”. T.E., págs. 747-748 (Tomo V).
El decimoctavo testigo del Ministerio Público fue el agente Noel Reyes. Éste testificó que el 5 de noviembre de 2001 se encontraba dando una ronda preventiva con la agente Melissa Díaz y el agente Orlando Guzmán. A eso de las 10:00 de la noche, recibió una llamada a través del sistema 911. El testigo relató que recibió el mensaje por el radio portátil de la Policía, en la que se indicó que había varios individuos sospechosos *827 merodeando por la Urbanización Industrial Corujo, en Bayamón. Varios minutos más tarde, recibió una llamada en su teléfono celular de parte del agente Galarza. Éste lo llamó desde su celular porque su radio “no funcionó” y le dijo que se trataba de un “diez cincuenta", “que les estaban tirando” y que “el compañero Acosta no lo veo, está herido”. T.E., págs. 762, 763 y 767 (Tomo V).
El testigo llevó al agente Acosta al hospital. Acosta iba en el asiento delantero. El sargento Orlando Pérez iba en la paite de atrás. Acosta pudo proferir algunas palabras antes de morir: “Bueno, él lo único que ... nos decía es ... Dios los bendiga ...y eso era todo lo que nos decía ... en todo momento él, Dios bendiga todo T.E., pág. 771 (Tomo V). Acosta murió esa misma noche. T.E., pág. 775 (Tomo V). El testigo no usó su arma de reglamento. T.E., pág. 773 (Tomo V).
El decimonoveno testigo presentado por el Ministerio Público fue el sargento Samuel Munich. El testigo le asignó la investigación del caso al agente Alvarado. Le ordenó “que hiciera contacto con los agentes de Ciencias Forenses para que participara en la investigación e hiciera su informe”. T.E., pág. 818 (Tomo V). Acosta ya había sido trasladado al hospital. Se le informó que “había un participante que había resultado herido y que el mismo lo habían trasladado para Centro Médico (se refiere a Miranda Class)”. T.E., pág. 819 (Tomo V). El testigo fue a su oficina para investigar si Miranda Class había sido fichado o si tenía antecedentes penales.
Al día siguiente de los hechos, el 6 de noviembre de 2001, el testigo le dijo al agente Alvarado que fuera a ver la condición de Miranda Class. A eso de las nueve de la mañana, el agente Alvarado le indicó que Miranda Class “estaba hablando y que estaba en la mejor disposición de cooperar en la investigación e inclusive les adelantó una información”. T.E., pág. 820 (Tomo V).
El testigo se trasladó al pueblo de Dorado para corroborar la información que ofreció Miranda Class sobre el apelante. El testigo arrestó al apelante Santiago Morales. A eso de las dos de la tarde de ese mismo día, 6 de noviembre, el testigo se dirigió hacia el Centro Médico en compañía del agente Alvarado, del agente Ramos y de los fiscales Jesús Peluyera y Francisco González. Miranda Class estaba en la Sala de Emergencia. El fiscal Peluyera se identificó y le explicó las razones por las cuales estaba allí. Miranda Class “al escuchar el fiscal pues, dijo que iba a cooperar y que iba a decir todo lo que sabía”. T.E., págs. 837-840 (Tomo V). El fiscal le hizo las advertencias de ley. Esto fue confirmado por Miranda Class. T.E., págs. 500-502 (Tomo IV). Miranda Class lucía “estable, estaba hablando por sí sólo, se le entendía todo lo que él estaba hablando... lo tenían con suero y vendaje en el área del cuerpo”. T.E., pág. 838 (Tomo V). Estaba herido en la pierna izquierda.
El vigésimo testigo de cargo fue el señor Edward Pérez Benitez, examinador de armas de fuego del Instituto de Ciencias Forenses. El 8 de noviembre de 2001 le entregaron tres pistolas Smith & Wesson, calibre nueve milímetros, y dos rifles, para ser sometidos al análisis de balística. El 8 de enero de 2001 se le entregó una pistola Smith & Wesson, calibre nueve milímetros, la cual surge de autos que era el arma de reglamento del agente Acosta. Uno de los rifles era un M-16, de fabricación norteamericana; el otro era un AK-47, de fabricación rusa. El testigo declaró que el rifle AK-47 tenía la capacidad de disparar y que si se cae “pudiera dispararse ”. “Puede haber muchas circunstancias en que ella se puede disparar e incluso en el alto de donde se caiga pudiera ayudar o influenciar para que se dispare”. T.E., págs. 923-925, 1105 y 1107 (Tomo VI). Las balas del rifle AK-47 son “mucho más grandes y... mucho más potentes”, que las balas que usan las pistolas Smith & Wesson, calibre nueve milímetros. T.E., pág. 919 (Tomo VI). El rifle AK-47 no puede usar una bala calibre nueve milímetros; tampoco puede usar una bala de un rifle M-16. Por otro lado, un rifle M-16 no puede usar las balas que usa el rifle AK-47 porque lo “tranca”-, tampoco puede usar las balas que usan las pistolas Smith & Wesson, calibre nueve milímetros de las que usan las pistolas de la Policía. T.E., pág. 920 (Tomo VI).
El examinador Pérez declaró que se le entregaron 59 casquillos de bala disparados; 35 eran calibre nueve milímetros; 10 eran calibre dos veintitrés, que es el calibre del rifle M-16 y 14 eran calibre 7.62x39, que es el *828 calibre que utiliza el rifle AK-47. T.E., pág. 946 (Tomo VI). Los 35 casquillos calibre nueve milímetros que “fueron disparados por dos armas ” se refiere al arma de reglamento del agente Geyl Galarza y a la pistola del agente Acosta. T.E., pág. 948 (Tomo VI). Los 10 casquillos calibre 2-23 fueron disparados por el rifle M-16. Los 14 casquillos calibre 7.62x39 fueron disparados por el rifle AK-47. T.E., pág. 953 (Tomo VI).
También se le entregaron 25 balas sin disparar (15 de éstas eran calibre nueve milímetros; cinco eran calibre 7.62x39). Del área de patología recibió unos proyectiles y blindajes extraídos del occiso. Eran siete piezas en total, los cuales fueron identificados así: El, E2, E3, E4, E5, E6 y E7). El proyectil El era calibre 7.62x39, que es el calibre del rifle AK-47. T.E., pág. 961 (Tomo VI). Los blindajes E5 y E6 también son calibre 7.62x39. T. E., pág. 962 (Tomo VI).
El examinador de armas de fuego concluyó que es probable que los proyectiles disparados con el rifle AK-47 fueron disparados en la escena y en el cuerpo del occiso Carlos Acosta Rey: “en cuanto al calibre y el estriado que queda a la derecha, que es compatible con esa arma e incompatible con todas las demás”. T.E., pág. 990 (Tomo VI). El proyectil E2, el fragmento de proyectil E3 y el blindaje E4, calibre nueve milímetros, no fueron disparados por las armas de fuego que se les ocuparon a los agentes de la Policía. T.E., págs. 957 y 959 (Tomo VI). Se le preguntó al testigo: “¿Si pudo haber sido un arma del modelo... Smith & Wesson típicas que utiliza la Policía de Puerto Rico?” El testigo contestó: “No. [...] Por el estriado. [...] Jamás y nunca lo podía disparar este modelo”. T.E., págs. 959-960 (Tomo VI). La pieza E7 es la parte interior de un proyectil de bala “que no tiene características propias de comparación”. T.E., pág. 962 (Tomo VI). No se puede determinar el arma que lo disparó ni el calibre. Dos de las pistolas Smith & Wesson, calibre nueve milímetros, no fueron disparadas. T.E., pág. 991 (Tomo VI). El examinador aclaró que no siempre los casquillos caen en el lugar donde ocurrió el disparo porque los casquillos son cilindricos y ruedan. T.E., pág. 1022 (Tomo VI). Además, precisó que los casquillos pueden ser expulsados a distancias de 4 a 6 pies y donde caigan dependerá de la variación del viento, del terreno y hasta de la forma de pararse. T.E., pág. 1024 (Tomo IV). Con este testimonio concluyó la prueba del Ministerio Público.
De otra parte, destacamos que la defensa tuvo oportunidad de presentar tres testigos, a saber, primero declaró el Sr. Romualdo Rodríguez, investigador forense del Instituto de Ciencias Forenses. Segundo, testificó el Sr. Ángel Rosario, empleado de seguridad de las oficinas AC-Forming en la Urb. Industrial Corujo. Por último, la defensa presentó a Katiria Soto, una joven de 16 años e hijastra del apelante.
Primeramente, el Sr. Romualdo Rodríguez testificó sobre cuánto tiempo dura una huella que: “[h]a habido situaciones que se han encontrado huellas hasta de nueve o diez años en una superficie”. T.E., pág. 1201 (Tomo VI). Se le preguntó: “¿Y a qué se debe que en una superficie no se pueda levantar huellas?”. El investigador contestó: “Se debe a diferentes factores, el tipo de superficie, las condiciones en que se tocó esa superficie, a las condiciones en que ese objeto que ha tocado ha estado expuesto al medioambiente, por el viento, el sol, la lluvia, la manipulación del objeto... químicos o a qué sustancias ha estado expuesta esa superficie, todo eso puede afectar”. T.E., pág. 1202 (Tomo VI).
El testigo declaró que en el rifle AK-47 “no se desarrollaron impresiones”. T.E., pág. 1225 (Tomo VI). Se le pidió una explicación al respecto y contestó: “Podría ser que las personas... no hayan tocado el arma. Que las personas usaron alguna clase de barrera entre el arma y las manos, un guante, etc. Número tres, que en sí, las armas de fuego son una pieza de evidencia extremadamente difícil para desarrollar impresiones dactilares”. T.E., pág. 1229 (Tomo VI). “Las armas son un objeto que están hechas de infinidad de materiales, están hechas con infinidad de tratamientos, están tratadas con diferentes tipos de químicos, grasas, aceites... diferentes tipos de metal,... todas esas circunstancias hacen que sea bien difícil que una impresión se adhiera a un arma”. T.E., pág. 1267 (Tomo VI). El testigo añadió que también va a depender de las “circunstancias en que el arma se encontraba en la escena, cómo el arma fue manipulada” o “que el arma se haya tirado haya caído en algún sitio y ese contacto con la superficie cuando cae exista roce y borre las impresiones”. T.E., *829 págs. 1230-1231 (Tomo VI).
El testigo declaró que en el abastecedor o magazine de rifle AK-47 tampoco se desarrollaron impresiones. T.E., pág. 1225 (Tomo VI). Éste declaró que ello podía deberse, además de las razones que había señalado anteriormente en relación con el rifle, a que el peine esté mohoso. T.E., pág. 1233 (Tomo VI). El testigo declaró que no pudo levantarle huellas digitales al resto de la evidencia (alicates, marcador, etc). Se le pidió al testigo una explicación al respecto y éste contestó: “Vienen aplicando las mismas... razones... las condiciones en que se usaron, las condiciones en que las personas entraron en contacto, la forma, en que se manejó el objeto... el ambiente". T.E., pág. 1236 (Tomo VI).
La defensa le mostró el arma de reglamento del occiso y el peine de esa pistola. El testigo declaró que no se desarrollaron impresiones. T.E., pág. 1252 (Tomo VI). El abogado del apelante tocó el arma, luego le preguntó si podía levantar alguna huella dactilar. El testigo contestó: “Podría arrojar positivo a impresión, como podría arrojar negativo”. Se le preguntó: “¿Aun yo habiéndola tocado?” El testigo contestó: “Aun usted habiéndola tocado". T.E., pág. 1259 (Tomo VI). Trasciende de la transcripción que el abogado del apelante no le hizo más preguntas a su testigo. El abogado del coacusado Torres Vega no le hizo ninguna pregunta.
Durante el contrainterrogatorio del Ministerio Público, el testigo se reafirmó en que “no todo objeto que se toca, va a ser posible levantar una huella”. T.E., pág. 1262 (Tomo VI). También declaró que en más de veinte casos “le han llevado... armas que han estado envueltas en asesinato, en robo, en escalamiento” y no ha podido levantarles huellas. T.E., pág. 1268 (Tomo VI).
El segundo testigo de defensa, el Sr. Ángel Rosario, declaró que el 5 de noviembre de 2001 entre 7:00 p.m y 8:00 p.m., unos camioneros le ofrecieron una información- la confidencia recibida no pudo ser presentada para el récord, debido a que el contenido de la información era prueba de referencia-, y él decidió llamar a su supervisor para que llamara a la Policía. T.E., pág. 1325 (Tomo VII). La Policía llegó como a los dos minutos. T.E., pág. 1325 (Tomo VII). Relató que se personaron dos agentes vestidos de civil (un varón y una fémina). Éstos fueron “a verificar sospechoso”. T.E., pág. 1332 (Tomo VII).
El testigo luego escuchó “unas detonaciones bien fuertes”. T.E., pág. 1328 (Tomo VII). “Nueve milímetros no puede ser porque eran bien potentes”, declaró el testigo. T.E., pág. 1332 (Tomo VII). Ése fue todo su testimonio.
Por último, la defensa presentó el testimonio de Katiria Salgado. La joven declaró que la semana antes de que arrestaran al apelante, lo vio discutiendo con el coacusado y testigo del Pueblo, Jorge Miranda Class. La hijastra del apelante precisó que no conocía a Miranda Class. Sin embargo, declaró que éste le estaba “manoteando” al apelante Santiago Morales. T.E., pág. 1378 (Tomo VII). Miranda Class estaba alterado. Trascendió que los hombres discutían por una mujer de nombre Jessica. Acotó que Miranda Class le reclamaba “que qué carajo él hacía con la mujer de él". T.E., pág. 1393 (Tomo VII). Según relató la joven, el apelante Santiago Morales le contestó a Miranda Class que “él no conocía a Jessica”. El apelante Santiago Morales estaba conviviendo con la mamá de la testigo. La testigo no sabe si el apelante denunció a Miranda Class. La testigo no le contó del incidente a su mamá.
La testigo también declaró que quiere al apelante Santiago Morales y que su mamá también lo quiere. T.E., pág. 1396 (Tomo VII). La testigo no le contó del incidente a la Policía. Su mamá tampoco lo hizo. La testigo declaró que ésta era la primera vez que ella declaraba en este caso. Con este testimonio, concluyó el desfile de la prueba oral.
Surge de autos que el tribunal archivó la acusación que pesaba contra el coacusado Torres Vega por infracción al Artículo 4.07 de la Ley de Armas, 25 L.P.R.A. § 458f, por posesión o uso ilegal de armas *830 automáticas o escopeta de cañón cortado. No obstante lo anterior, esa acusación subsistió en cuanto al apelante y estuvo fundamentada en la ametralladora que alegadamente portó éste y por el cual fue encontrado culpable.
Luego de evaluar toda la prueba presentada, el jurado emitió un veredicto de culpabilidad contra el apelante y el tribunal apelado lo sentenció a cumplir consecutivamente 257 años de reclusión.
Del mismo modo, el Tribunal de Primera Instancia declaró culpable al coacusado Torres Vega por todos los delitos por los que fue acusado, salvo, como dijimos, por el de infracción al Artículo 4.07 de la Ley de Armas, supra. Posteriormente, lo sentenció a cumplir diversas penas de reclusión que totalizaron 189 años con respecto a algunos delitos; y separación permanente de la sociedad mediante reclusión perpetua, con respecto a otros.
La doctrina del asesinato estatutario promulga que si una persona causa la muerte a otra al perpetrar o intentar perpetrar un delito grave, ya sea intencional o accidentalmente, entonces la muerte de dicha persona constituye asesinato en primer grado. Esta doctrina se basa en que el elemento de malicia para causar la muerte está implícito en el acto de la comisión del delito grave. Pueblo v. Lucret Quiñones, supra, a la pág. 740-. Se entiende que al cometerse el delito grave, el autor de éste ha puesto en marcha una sucesión de eventos que previsiblemente podían desembocar en la muerte de un ser humano. Es por ello que el autor del delito es responsable de todas las consecuencias naturales y probables del acto que inició. Pueblo v. Rivera Torres, 121 D.P.R. 128, 134(1988).
Ciertamente, la doctrina del asesinato estatutario no implica que toda muerte ocurrida durante la comisión del delito grave sea imputable al autor del delito. Para imputar una muerte al autor del delito tiene que existir una relación de causa y efecto entre el acto delictivo y la muerte ocasionada. Es por ello que, como dijéramos anteriormente, es necesario que el acusado o los participantes en el delito, aun cuando no mataron por mano propia, pusieran en marcha una sucesión de eventos que, previsiblemente, conduzcan a la muerte de la víctima del delito o de un tercero inocente. Véase, Pueblo v. Rivera Torres, supra, a la pág. 134; Pueblo v. Jiménez Hernández, 116 D.P.R. 632 (1985); Pueblo v. Calderón Laureano, 113 D.P.R. 574 (1982).
En el caso ante nos, la prueba presentada por el Ministerio Público estableció que el apelante perpetró un escalamiento y que una persona resultó muerta como producto del apelante haber puesto en curso una sucesión de eventos que previsiblemente podían desembocar en la muerte de un ser humano. Ello así, existe una relación de causa y efecto entre el acto delictivo y la muerte ocasionada. El apelante pudo prever que, durante la perpetración del escalamiento, o como consecuencia del mismo, alguien podía resultar herido o mueito; más aún cuando lo llevó a cabo utilizando armas de fuego de alto calibre. Aún así, puso en marcha unos eventos que resultaron en la muerte de un policía. Como el apelante tuvo la intención de cometer el delito de escalamiento y un ser humano murió a consecuencia del mismo, el delito de asesinato en primer grado en su modalidad de asesinato estatutario quedó configurado.
Hemos examinado minuciosamente los testimonios vertidos en el juicio -según presentados en la transcripción de la vista-, así como la prueba documental y física presentada por el Ministerio Público. Concluimos que todos los delitos imputados al apelante fueron probados más allá de duda razonable. No tenemos ante nos razón alguna para intervenir con la apreciación de prueba. Los testimonios de los testigos presentados por el Ministerio Público fueron detallados y cubrieron más allá de los elementos mínimos de los delitos. Estos incluyeron una descripción detallada de las circunstancias particulares que rodearon todo lo ocurrido el 5 de noviembre de 2001, desde que el apelante llegó a las inmediaciones de Empire Gas, hasta que terminó el incidente con la muerte del oficial. Del mismo modo, se presentó prueba de los eventos posteriores a la comisión de los delitos. Sabido es que, “la evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que la ley otra cosa disponga. ” Regla 10 (d) de Procedimiento Criminal, 34 L.P.R.A. Ap. IV. Al leer detenidamente la transcripción, podemos establecer con meridiana claridad que los testimonios vertidos fueron dirimidos por el jurado, mereciéndole entera credibilidad al *831 juzgador.
En el caso de marras, la prueba presentada por el Ministerio Público -el examen balístico demostró que los proyectiles recuperados en la autopsia procedían de armas de calibre 7.62x39, calibre AK-47-, demostró fuera de duda razonable la conexión del apelante con las acusaciones imputadas.
Es un requisito sine qua non que el Estado presente prueba respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de este último. Esto debe ser establecido más allá de duda razonable. Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 99 (2000); Pueblo v. Bigio Pastrana, supra, a la pág. 761. El Ministerio Público descarga su responsabilidad de probar su caso más allá de duda razonable, cuando su prueba es suficiente y produce certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Pueblo v. Mzarry, 156 D.P.R. 780 (2002).
Reiteramos que al examinar si la prueba presentada por el Ministerio Público cumplió con el requisito de demostrar más allá de duda razonable la comisión del delito imputado, estamos obligados a conferirle la mayor deferencia a la determinación del Tribunal de Primera Instancia. Un tribunal apelativo no debe intervenir con la apreciación de la prueba que hizo el Tribunal de Primera Instancia a menos que exista evidencia de que “se actuó con pasión, prejuicio, parcialidad o de que se incurrió en un error manifiesto.” Pueblo v. Acevedo Estrada, supra, a la pág. 99; Pueblo v. Rivero, supra, a la pág. 472. Esta norma reconoce el hecho de que los jueces de instancia y los jurados están en mejor posición para aquilatar la prueba que fue presentada. Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598-599 (1995). Esto es así, porque fueron ellos quienes vieron y oyeron declarar a los testigos y, por ello, su apreciación merece gran respeto y deferencia. Pueblo v. Acevedo Estrada, supra, a la pág. 99; Pueblo v. Rosario Reyes, supra, a la pág. 598.
El apelante no probó que hubo error, prejuicio o parcialidad en la apreciación de prueba, por lo que este Tribunal está impedido de intervenir con las determinaciones de hechos, la apreciación de la prueba y las adjudicaciones de credibilidad efectuadas por el jurado. Como dijéramos, la prueba presentada por el Ministerio Público fue suficiente para sostener la condena del apelante.
IV
Por los fundamentos que expresamos anteriormente, CONFIRMAMOS la sentencia apelada.
Lo acuerda y manda este Tribunal y lo certifica la Secretaria.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2008 DTA 23
1. En el Escrito de Apelación inicial presentado por derecho propio, el apelante imputó al Tribunal de Primera Instancia la comisión de ocho (8) errores.
2. Con posterioridad a la presentación del escrito de apelación por el apelante, este Tribunal advino en conocimiento de que el abogado de récord del apelante había fallecido. Ante ello, el Tribunal de Primera Instancia asignó como abogado de oficio al Lie. Hiram Torres Cuebas, quien objetó la designación y recurrió ante este Foro mediante recurso de Certiorari en el caso KLCE-06-00314. En el referido recurso, este Tribunal revocó la designación como abogado de oficio del Lie. Torres Cuebas e instruyó al foro de instancia a designar como abogado del apelante a la Sociedad Para Asistencia Legal.
3. Dicho Artículo fue derogado mediante la aprobación del Nuevo Código Penal, 2004.
4. Pueblo v. Rosario Reyes, 138 D.P.R. 591 (1995); Pueblo v. Cabán Torres, supra; Pueblo v. Ríos Álvarez, 112 D.P.R. 92 *832 (1982).
5. El Instituto, según descrito por la investigadora, “es donde se determina manera, modo y circunstancia de muerte.” T.E., pág. 19 (Tomo I).
6. Según el testimonio del agente Galarza, un “vehículo oficial es un vehículo no marcado, pero sí pertenece a ¡a Policía de Puerto Rico”. T.E., pág. 150.
7. Tarjeta, describió el agente, porque “todo el mundo nos puede ver...por las orillas son oscuras y como el centro es claro... el que esté en la orilla nos puede ver a nosotros...pero nosotros no podemos ver a nadie...lo que se ve es sombra a los lados...se ve oscuro... ”. T.E., pág. 159.